MARY KAY, INC., a/k/a Mary Kay Cosmetics, Inc. *v.*
Janet ISBELL

98-489                                                999 S.W.2d. 669

Supreme Court of Arkansas
Opinion delivered September 23, 1999

*Wright, Lindsey & Jennings,* by: *Roger D. Rowe, Nancy Bel-lhouse May,* and *Troy A. Price,* for appellant.

*Stephens Law Firm,* by: *K. Gregory Stephens;* and *Windle Turley, P.C.,* for appellee.

*Barret & Deacon, A Professional Association,* by: *D.P. Marshall Jr.,* for *amicus curiae* Direct Selling Association.

TOM GLAZE, Justice. This case requires our interpretation of the Arkansas Franchise Practices Act, Ark. Code Ann. § 4-72-201 to -210 (Repl. 1996 and Supp. 1997), and whether the Act applies to the business relationship established between appellee Janet Isbell and appellant Mary Kay, Inc. Rule 1-2(b). This court's jurisdiction is also invoked because the case presents issues of first impression and of substantial public interest and issues involving the need for clarification and development of the law.

Isbell's relationship with Mary Kay commenced in 1980 when she signed an agreement to be a beauty consultant for Mary Kay. As a consultant, Isbell was denominated an independent contractor, and, as such, she agreed to promote and sell Mary Kay products to customers at home demonstration parties; she was prohibited by the agreement from selling or displaying those products in retail sales or service establishments. Instead, a Mary Kay consultant's locations for selling products are her home or those of her potential customers.

After serving a short period as a beauty consultant and recruiting a sufficient number of her customers to be Mary Kay consultants, Isbell became entitled to be a unit sales director. Isbell signed her first sales director agreement on September 1, 1981, and a second one on July 1, 1991. As a director, Isbell continued to recruit beauty consultants and to help and motivate members of her unit in the sale of Mary Kay cosmetics. She also continued to serve as a beauty consultant. Isbell earned compensation in the form of a commission on sales she made directly to customers as a consultant; as sales director, she additionally received override commissions based on sales made by the consultants she recruited.

In 1994, Isbell leased storefront space in a Little Rock mall and used the space as a training center. It was about this time when Mary Kay began receiving complaints about Isbell's operation. By letter dated April 11, 1994, Mary Kay's legal coordinator, Sherry Gragg, referred Isbell to the parties' Sales Director Agreement and the company's Director's Guide which was made a part of that agreement. Gragg related that Isbell's office or training center was to be used only as a teaching center and to hold unit meetings. Gragg further instructed that Isbell's office or center should not give the appearance of a cosmetic studio, facial salon, or retail establishment, or be used to display or store Mary Kay products. Gragg reiterated that, under the parties' agreement, a sales director's office could not appear to be a Mary Kay store or be used to make direct sales to customers. Finally, Gragg admonished Isbell to discontinue all photo sessions of potential customers at such location and to remove any window sign advertising "glamour tips" or face makeover programs taking place at the center. Mary Kay also received complaints of Isbell's (1) overly

aggressive recruiting, (2) listing of fictitious recruits as consultants, and (3) check kiting practices.

Eventually, in September of 1995, Mary Kay's vice president of sales development, Gary Jinks, notified Isbell by letter that, under the terms of their agreement, the company was terminating its beauty consultant and sales director agreements, and the termination was effective thirty days from the date of the letter. On January 25, 1996, Isbell filed suit against Mary Kay in the Pulaski County Circuit Court, alleging that she was a franchisee under Arkansas's Franchise Practices Act and that Mary Kay failed to comply with the provisions of the Act when terminating Isbell.[1] Isbell asserted, among other things, that Mary Kay's letter of termination failed to comply with § 4-72-204 of the Act because the letter did not give her ninety days' notice or set forth the reasons for her termination. She alleged further that, while no notice was necessary if termination was initiated for "good cause" reasons listed under § 4-72-202(7) (C)-(H) of the Act, Mary Kay never explained in its letter that its termination was made for any of those listed reasons.[2] *See* § 4-72-204(b) and (c).

---

[1] Isbell's complaint also included other counts alleging conversion and defamation, but those matters are not relevant here, since this appeal is solely from the lower court's final judgment disposing of the issues pertaining to the Franchise Practices Act.

[2] "Good cause" means:

\* \* \*

(C) Voluntary abandonment of the franchise; or

(D) Conviction of the franchisee in a court of competent jurisdiction of an offense punishable by a term of imprisonment in excess of one (1) year, substantially related to the business conducted pursuant to the franchise; or

(E) Any act by a franchisee which substantially impairs the franchisor's trademark or trade name; or

(F) The institution of insolvency or bankruptcy proceedings by or against a franchisee, or any assignment or attempted assignment by a franchisee of the franchise or the assets of the franchise for the benefit of the creditors; or

(G) Loss of the franchisor's or franchisee's right to occupy the premises from which the franchise business is operated; or

(H) Failure of the franchisee to pay the franchisor within ten (10) days after receipt of notice of any sums past due the franchisor and relating to the franchise[.]

Mary Kay initially filed a motion to dismiss based on the forum selection clause in the parties' Sales Director Agreement providing that any dispute should be decided in Dallas, Texas, in accordance with Texas law. Texas has no franchise practices law. After the trial court denied Mary Kay's motion, both parties filed opposing motions for partial summary judgment. Mary Kay asserted its termination was not governed by Arkansas's Franchise Practices Act because Isbell was not a franchisee, and Isbell countered, contending the Act applied because she was a franchisee.

By letter opinion dated August 18, 1997, the trial court granted Isbell's motion, but in deciding in her favor, it offered no reason(s) why the court believed the parties' business relationship was covered by the Arkansas Act. In summarily ruling that the Act applied, the trial court proceeded by stating that the only question left for it to decide was whether Mary Kay's termination was proper under the Act. The trial court concluded that, if Mary Kay's actions failed to comply with the Act's termination provisions, it would allow the parties to try to a jury what damages, if any, Isbell incurred as a result of Mary Kay's improper termination. After the trial court ruled as a matter of law that Mary Kay's termination of Isbell had violated the Act, the parties tried the damages issue on September 18, 1997, and the jury returned a verdict in Isbell's favor in the amount of $110,583.33. Because neither party was fully pleased with the outcome and the trial court's various rulings, Mary Kay appealed, claiming three points for reversal, and Isbell cross appealed, asserting three separate reasons why the trial court erred.

The threshold issue to be decided is whether the Arkansas Franchise Practices Act applies, because if it does, Isbell would be entitled to the designation of franchisee and permitted to invoke the protections and benefits of that Act. The other five issues raised by the respective parties come into play only if the Act is ruled applicable to this case. Consequently, if we decide the Act is inapplicable to the undisputed facts in this case, we need not reach those additional five issues raised and argued on appeal by the parties.

■  To determine whether the Arkansas Franchise Practices Act applies to this case depends upon our interpretation and construction of the pertinent provisions of the Act. In this view, we turn first to Ark. Code Ann. § 4-72-202(1) (Supp. 1997), which in relevant part defines "franchise" to mean the following:

> [A] written or oral agreement for a definite or indefinite period, in which a person grants to another a license to use a trade name, trademark, service mark, or related characteristic within an exclusive or nonexclusive territory, or to sell or distribute goods or services within an exclusive or nonexclusive territory, at wholesale, retail, by lease agreement, or otherwise.

Clearly, Mary Kay entered into a written agreement with Isbell so that Isbell, as an independent contractor, could use Mary Kay's trademark and name to sell its products as provided by their agreement. Furthermore, as a sales director, Isbell agreed she would do no act detrimental to the validity of or injurious to the company's good will related to those marks.

■ ■  While the Act's definition of franchise is helpful, that definition alone is not dispositive of the issue as to whether Isbell, under the parties' agreement, is or is not a franchisee. The answer, however, can be found in §§ 4-72-203 and 4-72-202(6) of the Act. Section 4-72-203 clearly provides the Act applies only to a franchise that *contemplates or requires the franchise to establish or maintain a place of business in the state.* (Emphasis added.) Next, § 4-72-202(6) defines "place of business" under the Act as meaning "a fixed geographical location at which the franchisee [1] displays for sale and sells the franchisor's goods or [2] offers for sale and sells the franchisor's services." In short, Mary Kay submits that the parties, by their agreement, never contemplated or required that Mary Kay products or services be sold from a fixed location. To the contrary, Mary Kay posits that it and the parties' agreements required such goods and services *not* be sold or conducted from any office that could appear to be a retail establishment. In sum, citing these two statutes, Mary Kay submits that no fixed geographical location for selling products or services was ever contemplated, much less required, by the parties' agreement, and this reason is sufficient alone to preclude Isbell's reliance on the Act. We agree.

We first should note that Isbell concedes that, as a sales director, her agreements with Mary Kay provided that she could not display for sale or sell Mary Kay products from an office, whether that office was located in her home or her training center. In fact, Isbell testified that she never displayed or sold Mary Kay products from her training center, and to have done so would have been a violation of her agreement with Mary Kay.

While conceding that the parties' agreements never contemplated that Isbell would or could sell the franchisor's goods from a fixed location, she argues no such prohibition prevented her from selling Mary Kay services from her home or training center. Specifically, Isbell suggests the facial makeovers and "Glamour Shots" photo sessions that were a part of Mary Kay's demonstration and training program constituted services that the parties contemplated could be sold by Isbell from her center.[3] In making this argument, Isbell relies in part on the case of *Dr. Pepper Bottling Co. v. Frantz*, 311 Ark. 136, 842 S.W.2d 37 (1992), where Frantz entered into a distributorship agreement to sell the company's beverages in eleven counties in Arkansas. The agreement contained no provision obligating Frantz to maintain a particular place of business. Nevertheless, Frantz purchased a warehouse for $100,000 in order to inventory and distribute Dr. Pepper's beverages. Because the parties' agreement did not prohibit Frantz from selling the company's products from the warehouse location and because a company's representative actually viewed the site and believed it was a "good idea" and a "good investment," this court concluded the parties' business relationship was covered by the Arkansas Franchise Practices Act.

▮ The *Frantz* holding simply is not controlling here. For example, Mary Kay's Director's Guide, which was made a part of the parties' agreements, very clearly provided that a sales director's office, albeit it her home or training center, could only be used to interview potential recruits and hold unit meetings and other

---

[3] In other terms, Isbell reasons that if a demonstration or training session is a part of her job for which she is paid compensation in the form of a commission, Isbell claims these services are sold even though no charge was actually designated for such services at the time the product was sold.

training events. The Guide further provided that the office or center should *not* give the appearance of a cosmetic studio, facial salon or retail establishment, or give the appearance of being a "Mary Kay" store. Further distinguishing this situation from that presented in *Frantz* was the April 1994 letter from Mary Kay's legal coordinator warning Isbell not to use her office for displays and sales of Mary Kay products or for makeover and photo sessions. Thus, nowhere in the parties' Guide or agreements can it be fairly said that the parties ever contemplated that Isbell could use her office or center as a fixed location to display or sell Mary Kay products or services.

Even if we could agree with Isbell's contention that she was not prohibited from selling (or was otherwise authorized to sell) Mary Kay services, her argument must fail for another reason. Isbell simply never showed she sold Mary Kay services. She claims that because her contract requires her to provide motivational, counseling, and training services, such services should be considered part of the sale and commission when the product is actually sold. Isbell offered no proof as to what part of the commission, if any, was attributable to services. Neither Isbell nor Mary Kay was shown to have received any separate compensation for services provided to potential customers, but, to the contrary, evidence was presented showing these services, like the photographs taken at makeover sessions, were provided at cost with only the photographer receiving payment.

Finally, Isbell argues that her home constituted a place of business under the Act because as a consultant she occasionally displayed and sold products there. This argument, however, is not supported by the parties' agreement, since it never contemplated a fixed location for the display and sale of products. As previously stated, a Mary Kay consultant's locations for selling products are her home or those of her potential customers. Furthermore, Isbell's reliance on the *Frantz* case is misplaced because Frantz maintained regular business hours at the warehouse where products were on display and sold. It is thus clear that the requirement of a fixed location is not satisfied by occasional sales from either Isbell's home or the homes of her potential customers.

In sum, we conclude that the agreements between Janet Isbell and Mary Kay did not contemplate the establishment of a fixed place of business as that term is defined in Ark. Code Ann. § 4-72-202(6). As such, the business relationship entered into by Isbell and Mary Kay was not a franchise within the protection of the Arkansas Franchise Practices Act, and the court below erred in so holding. We therefore reverse and dismiss.