SOUTH BEACH BEVERAGE COMPANY, Inc., and South Beach Beverage Company, LLC *v.* HARRIS BRANDS, INC.

02-1367                                                     138 S.W.3d 102

Supreme Court of Arkansas
Opinion delivered December 11, 2003

*Conner & Winters, P.L.L.C.*, by: *Todd P. Lewis* and *John R. Elrod*, for appellants.

*Lax, Vaughan, Fortson & McKenzie, P.A.*, by: *Grant E. Fortson*; and *Shemin & Hendren, PLLC*, by: *Kenneth R. Shemin*, for appellee.

R OBERT L. BROWN, Justice. This appeal is brought by appellants South Beach Beverage Company, Inc., and South Beach Beverage Company, LLC (South Beach), from a judgment in favor of appellee Harris Brands, Inc., in the amount of $993,430. South Beach further appeals an award of attorney's fees in the amount of $250,000. South Beach raises several points on appeal. It first contends that Harris Brands could not recover on its theory of violation of the Arkansas Franchise Practices Act, because Harris Brands failed to present sufficient evidence on whether a warehouse was "contemplated" and whether it met the Act's definition of a "place of business." South Beach also claims that Harris Brands cannot recover future profits purportedly lost in both Arkansas and Oklahoma and that the circuit court erred in awarding Harris Brands $250,000 in attorney's fees. South Beach further raises points for reversal, including a contention that Harris Brands was not entitled to future lost profits on its promissory estoppel claim and that the circuit court erred in its rulings relating to taxation of any jury award and the allocation of fixed expenses against lost profits. We affirm the judgment for violation of the Arkansas Franchise Practices Act, but we reverse the award of attorney's fees and remand for a determination of reasonable fees using the *Chrisco* factors.

South Beach is a Delaware corporation with its principal place of business in Norwalk, Connecticut. It manufactures new

age beverages and juices, including a brand named SoBe, which it began marketing in 1996. Harris Brands was a Delaware corporation with its principal place of business in Tulsa, Oklahoma. Harris Brands was a beverage distributor, and for part of the time in question in the instant case, it distributed beverages in northwest Arkansas.

In April 1998, South Beach and Harris Brands began discussions about Harris Brands distributing SoBe in Oklahoma. In November or December 1998, Joe Harris, founder of Harris Brands, and representatives of South Beach agreed that Harris Brands would begin marketing SoBe in Oklahoma. According to John Bello, President of South Beach, Joe Harris "jumped on the bandwagon." There was no contract signed by the parties.

In April 1999, South Beach asked Harris Brands to distribute SoBe in northwest and central Arkansas. According to Joe Harris, South Beach officials promised him that if Harris Brands did a good job, it would continue operating as the SoBe distributor for the territory. Also according to Joe Harris, Harris Brands then began investing money in advertising and equipment and hiring employees for the purpose of distributing SoBe, all in reliance on South Beach's promise. Harris Brands distributed SoBe in Oklahoma and northwest Arkansas between April 1999 and April 2001. During that time, it spent $141,181.24 promoting SoBe.

In October 2000, Johnny Blevins of South Beach wrote a memorandum called a "Lizardgram" to Joe Harris in which he said:

> There is no question that we were only able to see a portion of the N. Arkansas market. Many opportunities still remain for the development of this area, however, if it is all developed to this level, you may need to look for a satellite warehouse for Arkansas.

Joe Harris then contracted with RC/Eagle Distributing, Royal Crown Cola's distributor in Harrison, to be a subdistributor of SoBe, and a South Beach representative agreed to it. Joe Harris considered establishing a satellite warehouse in Arkansas, because he believed there would be enough SoBe sales to warrant having a warehouse out of which retailers could directly buy SoBe beverages.

Also in October 2000, South Beach sold a majority position in SoBe to PepsiCo. At a meeting in Las Vegas, Nevada, in December 2000, John Bello on behalf of South Beach assured

SoBe wholesalers, including Joe Harris, that if they performed well, they would keep their SoBe distributorships despite the sale to PepsiCo. On February 16, 2001, South Beach notified Joe Harris that it was terminating its SoBe distributorship agreement with Harris Brands, effective April 23, 2001, due to "planned distributor changes in your area." At the time, SoBe distribution amounted to about fifty percent of Harris Brands' gross profit, which was about $440,000 a year. South Beach offered to pay Harris Brands $3.00 for each case of SoBe sold to retailers during the twelve-month period immediately prior to termination. Joe Harris estimated this buy-out figure to be about $240,000. Harris Brands refused the offer. In November 2001, Harris Brands went out of business.

On June 20, 2001, Harris Brands sued South Beach for damages for violation of the Arkansas Franchise Practices Act due to wrongful termination of the SoBe distributorship agreement and, secondly, on a theory of promissory estoppel. It sought damages in the form of lost profits in both its Oklahoma and Arkansas distributorships as well as reasonable attorney's fees, interest, and costs. In an amended complaint, Harris Brands added an allegation that South Beach had perpetrated a fraudulent scheme under the Franchise Act and asked for punitive damages and treble damages.

Trial began in July 2002 and lasted three days. At trial, Joe Harris described the Harris Brands distributorship arrangement with South Beach relative to SoBe and the multiple promises South Beach made to him about keeping the distributorship if his company performed well. He testified that South Beach did not have good cause to terminate the arrangement. Cheryl Shuffield testified as Harris Brands' economic expert for damages. She offered four different calculations for future lost profits. Two calculations were based on lost profits for six years, and two were based on ten years. One six-year study and one ten-year study reduced projected lost profits by fixed costs, and the remaining studies did not.

South Beach presented testimony that Harris Brands never contemplated establishing a place of business in Arkansas, as required by the Franchise Practices Act, and, furthermore, failed to show reasonable reliance, which is a necessary component of promissory estoppel. South Beach argued that damages for any of

Harris Brands' claims should be limited to out-of-pocket expenses incurred by Harris Brands, which totaled $141,181.24.

The jury returned two verdict forms: one for violation of the Franchise Practices Act with damages of $993,430, and a second on the claim of promissory estoppel with damages also in the amount of $993,430. The circuit court limited damages to $993,430 on the basis that the two verdicts amounted to double recovery. In response to a subsequent motion to tax costs, including attorney's fees, the circuit court awarded attorney's fees of $250,000 to Harris Brands' counsel. Later, the court denied South Beach's motions for a new trial and judgment notwithstanding the verdict.

South Beach has now appealed. We note as an initial matter that the judgment entered awards Harris Brands $993,430 based on two distinct theories: violation of the Franchise Act and promissory estoppel. This is similar to a situation we have recognized in the past involving general verdicts where we cannot determine upon which theory the damage award was premised. *See, e.g., Hyden v. Highcouch, Inc.*, 353 Ark. 609, 110 S.W.3d 760 (2003) (this court will not reverse an award of damages without indication of how the jury reached its award of damages and without evidence that the jury members did not follow the trial court's instructions). Thus, if Harris Brands can prevail on either theory, the judgment must be affirmed.

*I. Arkansas Franchise Practices Act*

*a. Contemplated Place of Business*

South Beach first contends that Harris Brands cannot recover for violation of the Franchise Practices Act, because it established no place of business in the state, as the Act requires, but merely thought it might do so in the future. We turn then to the relevant statutory language.

The Arkansas Franchise Practices Act is found at Ark. Code Ann. §§ 4-72-201 through 4-72-210 (Repl. 2001). Section 4-72-202 defines the following terms:

> (1)(A) "Franchise" means a written or oral agreement for a definite or indefinite period in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic within an exclusive or nonexclusive territory

or to sell or distribute goods or services within an exclusive or nonexclusive territory at wholesale or retail, by lease agreement, or otherwise.

. . . . .

(6) "Place of business" means a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services.

Section 4-72-203 states in part that the Franchise Act "applies only to a franchise entered into, renewed, or transferred after March 4, 1977, the performance of which contemplates or requires the franchise to establish or maintain a place of business within the State of Arkansas."

In support of its argument, South Beach points out that Harris Brands utilized only two physical structures in Arkansas—a storage facility in Fort Smith and RC/Eagle Distributing in Harrison. Neither qualifies as a place of business, according to South Beach. For example, it emphasizes that RC/Eagle Distributing sold a minimal amount of SoBe, and neither structure had "displays for sale," as the Act requires.

South Beach cites two cases to support its position: *Mary Kay, Inc. v. Isbell*, 338 Ark. 556, 999 S.W.2d 669 (1999), and *Dr. Pepper Bottling Co. v. Frantz*, 311 Ark. 136, 842 S.W.2d 37 (1992). In *Mary Kay*, South Beach correctly observes that this court reversed a judgment in favor of the franchisee on the basis that the franchisee and Mary Kay never contemplated that products or services would be sold from a fixed location. In *Dr. Pepper*, the franchisee had constructed a warehouse from which it distributed Dr. Pepper beverages. A Dr. Pepper representative had viewed the site and thought it was a good idea. The franchisee maintained regular business hours at the warehouse and serviced numerous retail outlets with Dr. Pepper products. South Beach argues that the Dr. Pepper business operation, contrary to the case before us, was established and clearly qualified as a place of business.

Despite these two cases, there is no doubt in this court's mind that Harris Brands and South Beach contemplated a place of business in Arkansas. As already noted, a South Beach representative, Johnny Blevins, wrote Joe Harris: "There is no question that we were only able to see a portion of the N. Arkansas market. Many opportunities still remain for the development of

this area, however, if it is all developed to this level, you may need to look for a satellite warehouse for Arkansas." Mr. Harris testified that he believed this warehouse would be set up like his warehouse in Oklahoma with SoBe products for sale and displayed for sale. We hold that this correspondence between the parties affirms the fact that the parties contemplated that a satellite warehouse would be necessary, if the SoBe business developed as anticipated.

As far as whether the satellite warehouse would qualify as a place of business under § 4-72-202(6), Joe Harris testified that he anticipated the warehouse would have a telephone, forklift, SoBe product for distribution, and personnel to run operations. It would be a message center as well. He further contemplated having sales displays at the Arkansas satellite warehouse. And Harris Brands already had an outlet for SoBe in Harrison with RC/Eagle Distributing acting as a subdistributor with South Beach's permission. Joe Harris's testimony is sufficient for a holding that substantial evidence exists to meet the definition of "place of business." Hence, we conclude that the Arkansas Franchise Practices Act applies to protect Harris Brands from wrongful termination of its agreement.

*b. Arkansas and Oklahoma Damages*

South Beach next contends that the Franchise Act's purpose is to protect franchisees and their customers who are located only in Arkansas. Thus, according to South Beach, it would violate the letter and the spirit of the Franchise Act to allow Harris Brands to recover damages for future lost profits for the distributorship in Oklahoma. Furthermore, South Beach argues that Harris Brands failed to prove that its Oklahoma damages were recoverable under the Franchise Act, because future lost profits in Oklahoma were speculative and not covered by the Arkansas Act.

We hold that this argument is not preserved for our review, because South Beach failed to move for a directed verdict on this point during the trial and, further, failed to obtain a ruling on it from the circuit court. Rule 50(e) of the Arkansas Rules of Civil Procedure provides: "When there has been a trial by jury, the failure of a party to move for a directed verdict at the conclusion of all the evidence . . . will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the jury verdict." *See also Stroud Crop, Inc. v. Hagler,* 317 Ark. 139,

875 S.W.2d 851 (1994). South Beach did move for a directed verdict but only on the points of whether Harris Brands had established a place of business in Arkansas and whether Harris Brands reasonably relied on any promises that South Beach made.

The point regarding Oklahoma damages was never raised until after all the evidence had been presented, and the attorneys were discussing the jury instructions with the circuit court. The circuit court agreed with Harris Brands that an instruction for damages incurred in both Oklahoma and Arkansas was appropriate, because the Act does not limit damages just to Arkansas. We need not address that particular point, because no evidence was presented to the jury separating out the Arkansas and Oklahoma damages, and by the jury-instruction stage, it was simply too late to do so. We affirm the circuit court on this point.

## II. Attorney's Fees

For its next point, South Beach argues that the $250,000 awarded as attorney's fees under Ark. Code Ann. § 4-72-208(b) (Repl. 2001), was excessive and punitive and certainly not "reasonable," as the statute requires. South Beach contends that while no court has determined what "reasonable" means under the Franchise Act, this court has determined many times what is "reasonable" under other Arkansas statutes that concern attorney's fees. *See, e.g., Phelps v. U.S. Credit Life Ins. Co.*, 340 Ark. 439, 10 S.W.3d 854 (2000); *Crawford & Lewis v. Boatmen's Trust Co.*, 338 Ark. 679, 1 S.W.3d 417 (1999); and *Griffin v. First Nat'l Bank*, 318 Ark. 848, 888 S.W.2d 306 (1994). In the instant case, South Beach asserts that Harris Brands' attorneys asked for a contingency fee of twenty-five percent of the judgment, rather than an award based on the actual hours they spent on the case, which totaled 438.95 hours. South Beach calculates that these hours multiplied by a $150 hourly rate would yield $65,824.50 in attorney's fees for Harris Brands' counsel. This, South Beach maintains, qualifies as reasonable.

Harris Brands, on the other hand, contends that the circuit court did not abuse its discretion in awarding the attorney's fees, because there is no fixed formula for determining the reasonableness of such fees. Because the circuit court was in a superior position to make this determination, and because the court of appeals approved an attorney's fee award based on a forty percent contingency arrangement in *Capitol Life & Accident Ins. Co. v.*

*Phelps*, 76 Ark. App. 428, 66 S.W.3d 678 (2002), Harris Brands argues that the fee was reasonable.

This court discussed the criteria to examine in determining whether attorney's fees are reasonable in *Phelps v. U.S. Credit Life Ins. Co.*, *supra* (consider attorney's experience and ability, time and labor required to perform the service properly, amount in controversy and result of the case, novelty and difficulty of the issues, fee customarily charged for similar services in the local area, whether the fee is fixed or contingent, time limitations placed on the client, and likelihood that acceptance of particular employment will preclude other attorney employment); *Griffin v. First Nat'l Bank*, *supra* (consider whether the actions taken by the party seeking fees were meritorious or successful); *Northwestern Nat'l Life Ins. Co. v. Heslip*, 309 Ark. 319, 832 S.W.2d 463 (1992); *Sutton v. Ryder Truck Rental, Inc.*, 305 Ark. 231, 807 S.W.2d 905 (1991) (consider attorney's skill and experience, relationship between the parties, difficulty of the services, extent of the litigation, time and labor, fee customarily charged, and results obtained); and *Miller's Mutual Ins. Co. v. Keith Smith Co.*, 284 Ark. 124, 680 S.W.2d 102 (1984) (consider attorney experience and ability, time and work required, amount in controversy and results obtained, and fee charged in the locality; actual time spent and customary charge is important).

More recently, in *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002), this court spoke of eight factors for a trial court to invoke when determining the proper attorney's fee to be awarded. The factors were gleaned from *Chrisco v. Sun Indus.*, 304 Ark. 227, 800 S.W.2d 717 (1990), and read as follows:

> (1) the experience and ability of counsel; (2) the time and labor required to perform the legal service properly; (3) the amount involved in the case and the results obtained; (4) the novelty and difficulty of the issues involved; (5) the fee customarily charged in the locality for similar services; (6) whether the fee is fixed or contingent; (7) the time limitations imposed upon the client or by the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

*Lake View*, 351 Ark. at 95, 91 S.W.3d at 510.

■ We further recognized in *Chrisco* the superior perspective of the circuit court to weigh the factors and concluded that we would not reverse a circuit court's determination absent an abuse of discretion. In *Lake View,* this court concluded that attorney's fees based on the hours worked at an hourly rate of $150 was appropriate for that case based on the novelty and difficulty of the case, the results obtained, the hours worked, the expertise of counsel, and the effect on other legal work of counsel. We concluded that the circuit court had abused its discretion, and we reduced the fees awarded.

■ In the case before us, the circuit court did not perform an analysis of the *Chrisco* factors, which we consider to be the touchstone for deciding what are reasonable attorney's fees under the Franchise Act. We reverse and remand for the circuit court to make such an analysis.

### III. Other Issues

South Beach also urges that the theory of promissory estoppel, which was a second basis for the judgment, is not supported by substantial evidence, and, moreover, damages for lost profits are not appropriate for a promissory estoppel claim. According to South Beach, only "reliance" damages are appropriate. In addition, South Beach argues that the circuit court erred in its ruling on the prejudicial impact of the statement of Harris Brands' counsel to the jury about the payment of taxes on any jury award and by permitting the jury to consider calculations for lost profits that did not deduct a proportionate share of fixed expenses.

#### a. Promissory Estoppel and Lost Profits

■ We need not address the lost–profit point as it is clear to this court that the judgment can be affirmed on the theory of a violation of the Franchise Act without reference to the claim of promissory estoppel. Furthermore, South Beach did not contest the award of lost-profit damages under the Franchise Act at trial but only did so with respect to promissory estoppel. As the jury was also instructed on lost profits as a measure of damages for wrongful termination under the Franchise Act and no objection was made to this instruction, a lost–profits damage award under the Franchise Act theory was uncontested. Because we are affirming on the alternative theory of violation of the Franchise Act, the

lost-profit-damages point related to the theory of promissory estoppel need not be considered.

### b. Payment of Taxes/Closing Argument

South Beach contends that the circuit court erred in not granting a mistrial when Harris Brands' counsel advised the jury in closing argument that Harris Brands would have to pay taxes on any damage award. The effect of this, South Beach claims, was to encourage the jury to return a verdict for greater damages. South Beach analogizes counsel's closing argument to a violation of the collateral-source rule.

We note on this issue that it was South Beach that first injected the issue of income taxes into the trial when counsel for South Beach questioned its own expert witness about whether Harris Brands' damage calculations were flawed due to no deduction for taxes. This matter was pursued on cross-examination by counsel for Harris Brands, without objection. We agree with the circuit court that any closing argument on this point was a comment on the evidence. The circuit court did not abuse its discretion in denying the mistrial motion.

### c. Fixed Expenses

South Beach finally contends that Harris Brands' expert witness, Cheryl Shuffield, was permitted to submit two projections for lost profits to the jury and that those two projections failed to deduct the proportionate share of fixed overhead costs. According to South Beach, these damage calculations were incomplete and misleading.

We agree with Harris Brands that South Beach failed to make this specific objection to the circuit court during Ms. Shuffield's testimony. It is elementary that this court will not consider an issue raised for the first time on appeal. *See, e.g., Holcombe v. Marts*, 352 Ark. 201, 99 S.W.3d 401 (2003). Accordingly, we will not consider this point.

In sum, we affirm the judgment for violation of the Arkansas Franchise Practices Act and reverse and remand that part of the judgment that relates to attorney's fees.

Affirmed in part; reversed and remanded in part.