2011 Ark. App. 244

**William Stacey GILLISON, Appellant**

v.

**Mary Carol Talbot GILLISON, Appellee.**

**No. CA 10–924.**

Court of Appeals of Arkansas.

March 30, 2011.

Sharon Elizabeth Echols, Little Rock, for appellant.

Eugene J. Mazzanti, Little Rock, Paul Weldon Keith, Monticello, for appellee.

DOUG MARTIN, Judge.

Appellant William Stacey Gillison (Stacey) appeals from an order of the Chicot County Circuit Court that, among other things, modifies Stacey's child-support obligations and orders him to pay attorney's fees for his ex-wife, appellee Mary Carol Talbot Gillison (Carol). We affirm all but one of the issues raised in this appeal; we reverse and remand the award of attorney's fees for further consideration.

Stacey and Carol were married February 14, 1992, and divorced by decree entered October 4, 2005. Incorporated into the divorce decree was a "Custody, Child Support, and Property Settlement Agreement" (the Agreement). Pursuant to the Agreement, Carol was to have physical custody of the couple's four children, while Stacey was given "reasonable and liberal visitation rights." In addition, the Agreement provides that Stacey was to pay child support in the amount of $1500 per month for the care and maintenance of the minor children so long as they lived with Carol, and Stacey was "responsible for payment of the costs for the minor children to attend a public or private school [including] the cost for tuition, uniforms, and bus fees."

The Agreement further provides that Carol and the parties' minor children be allowed to live in the marital home in Lake Village "until the youngest child graduates from high school or turns eighteen (18), whichever occurs last." The Agreement contains the following proviso regarding the marital home:

Should [Carol] remarry, live with another person, or move another person into the marital home prior to May of 2013, then the marital home shall be

sold or appraised immediately and [Carol] shall pay fifty percent of the equity or appraised value to the William N. Gillison Revocable Trust.

Carol agreed to pay the mortgage payments on the home.

Concerning alimony and spousal support, the Agreement provides that Stacey was to pay Carol $1500 per month as alimony. As each child graduated or completed his or her high school education, the spousal support would be reduced by $375 per month following graduation and would be eliminated entirely no later than May 2013. The Agreement provides that spousal support would terminate immediately if Carol remarried, lived with another man, or moved another man into the marital home.

On February 9, 2009, Stacey filed a motion for contempt in the Chicot County Circuit Court, alleging that Carol had failed to timely make the mortgage payments as required under the Agreement. Stacey sought modification of the Agreement and divorce decree to transfer direct responsibility for the mortgage payments from Carol to Stacey. In addition, Stacey alleged that Carol had violated the divorce decree by moving another person into the marital residence.

Carol filed an answer to Stacey's motion for contempt in which she admitted that "occasional mortgage payments on the realty have been a few days late," but she asserted that the reason for the late payments was Stacey's failure to make his alimony and child-support payments on time. Carol agreed that responsibility for the mortgage payments should be transferred to Stacey, but she denied that the home should be sold.

Carol filed a counterpetition for modification of the Agreement in which she alleged that the monthly child-support payment should be increased to $2500 per month; that the responsibility for the mortgage payments, taxes, and insurance on the marital home should be transferred to Stacey; that the property should be sold and equally divided when the couple's youngest child reached the age of eighteen and graduated from high school; that alimony payments should remain $1500 per month and never be reduced until they terminated; and that Stacey should be ordered to cease and desist from deducting from his child-support payments expenses associated with taking the children on trips and vacations.

Carol amended her counterpetition on May 21, 2009, asking the court to order Stacey to cease and desist from threatening Carol and the children with stopping the support payments and selling the house. She filed a second amended counterpetition on July 1, 2009, asserting that their oldest child had graduated from high school in May 2008, thus reducing Stacey's alimony obligation to $1125 per month. She alleged that Stacey had not paid alimony for the months of June and July 2008 and was thus in arrears. Carol also noted that the child-support agreement does not state that Stacey could automatically reduce his child-support payments when a child graduated from high school or reached the age of eighteen, and she complained that Stacey had unilaterally reduced his child-support payments from $1500 to $1125 per month when their oldest child graduated from high school, without first obtaining permission from the court. Accordingly, Carol alleged that Stacey was $2246 in arrears for the months of June 2008 through July 2009.

The matter proceeded to trial on November 3, 2009, and the circuit court issued a letter opinion on March 23, 2010. The court noted that the couple's oldest child turned eighteen on March 30, 2008, and graduated from high school in May of

that year; in addition, another child, who had been living with Stacey since August 2009, was to turn eighteen in July 2010. The court also pointed out that Carol had not remarried and continued to live in the marital residence with two of the parties' minor children as well as her one-and-a-half-year-old child by another man, Terry Seaman.

Regarding the marital residence, the court found that the parties stipulated that the Agreement was contractual in nature and independent of the divorce decree. According to the terms of the Agreement, the court stated that the marital home had to be sold only if Carol should remarry, live with another person, or move another person into the marital home prior to May 2013. The court found that none of these contingencies had occurred, so the home should not be sold at that time. The court stated that it "[did] not consider the one and one-half year old child born of [Carol's] relationship with Terry Seaman as being 'another person' as contemplated by the provision prohibiting moving another person into the marital home." The court did order, however, that Stacey was to take over the mortgage payments and should receive credit for the monthly house payment against his child-support obligation.

Regarding the alimony, the court found that the Agreement was an independent contract and that, in the absence of the occurrence of any of the events specified therein, the court had no authority to modify or terminate alimony. Because Carol had not "remarried, lived with another man, or moved another man into the marital home," the court found that alimony should not be terminated. The court noted that the oldest child had turned eighteen, and Stacey was thus entitled to reduce the alimony payments by $375 per month beginning in June 2008. The court ruled, however, that Stacey had violated the terms of the agreement by unilaterally reducing his alimony obligation by half during his two months of extended summer visitation during the summer of 2008.[1] Because that provision referenced only child support, not alimony, the court found that Stacey's reduction in alimony was improper and that he was indebted to Carol for that additional amount.

The court then considered the question of child support, finding that, pursuant to the Agreement, Stacey was to pay $1500 per month in child support "for as long as [the children] live with [Carol]." Because there was no provision in the Agreement for an automatic reduction in child support when a child reached eighteen years of age and graduated from high school, the court found that Stacey might have been entitled to an adjustment upon proper petition when the oldest child turned eighteen or the second-oldest child moved in with him, but that he had not sought a modification or reduction through the date of the court's order.

Relying on *Ward v. Doss*, 361 Ark. 153, 205 S.W.3d 767 (2005), the court determined that Stacey was entitled to an automatic termination of his support obligation for the oldest child when the child turned eighteen in May 2008. The court then calculated the amount of Stacey's child-support obligation from June 2008 through March 2009 for the other three children, concluding that Stacey owed Carol $7070 in child support. The court also found that Stacey was $2520.35 in arrears for the period from April 2, 2009, through the trial

1. The parties' visitation schedule, incorporated into the Agreement, provided that, if "support" was current, "support shall abate by 50 percent" during Stacey's periods of extended summer visitation.

date. In making its calculations, the court specifically considered the increase in Stacey's income, the increased age of the children and their increasing needs, the oldest child's reaching the age of eighteen, and the second-oldest child's moving in with Stacey.

Finally, the court denied Stacey's request to give him an accounting credit or offset for the expenses of the children's private-school education. The court found that "[e]ducational expense was a matter that was part of the independent agreement or contract thoroughly negotiated and entered into by the parties in 2005, and the court declines to grant a deduction from net pay for that expense."

The court entered an order on May 28, 2010, reflecting the findings made in its letter opinion. Stacey filed a timely notice of appeal on June 17, 2010, and he now raises five arguments for reversal.

Our standard of review for an appeal from a child-support order has been set out frequently: we review equity cases de novo on the record, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. Ark. R. Civ. P. 52(a); *McWhorter v. McWhorter*, 346 Ark. 475, 58 S.W.3d 840 (2001); *Myrick v. Myrick*, 339 Ark. 1, 2 S.W.3d 60 (1999). In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *McWhorter, supra; Hunt v. Hunt*, 341 Ark. 173, 15 S.W.3d 334 (2000). As a rule, when the amount of child support is at issue, we will not reverse the circuit court absent an abuse of discretion. *Kelly v. Kelly*, 341 Ark. 596, 19 S.W.3d 1 (2000); *Scroggins v. Scroggins*, 302 Ark. 362, 790 S.W.2d 157 (1990). However, a circuit court's conclusion of law is given no deference on appeal. *Kelly, supra; City of Lowell v. M & N Mobile Home Park, Inc.*, 323 Ark. 332, 916 S.W.2d 95 (1996).

In his first argument on appeal, Stacey contends that the circuit court erred when it "retroactively" modified the child-support order effective June 1, 2008, instead of March 12, 2009, when Carol filed a motion to modify Stacey's child-support obligation. As noted above, the court found that Stacey was correct in assuming that he was no longer responsible for supporting the oldest child once the child turned eighteen in May 2008. *See* Ark. Code Ann. § 9–14–237 (Repl.2009); *Office of Child Support Enforcement v. Tyra*, 71 Ark.App. 330, 29 S.W.3d 780 (2000). Given the termination of Stacey's support obligation by operation of law in May 2008, the court determined Stacey's current support obligation to the remaining children.

Citing *Ward v. Doss, supra*, the court determined that Stacey's support obligation should be calculated from June 2008 for the remaining children, taking into account his income as of that date, and that he should be given retroactive credit or assessed for any amount he paid between June 1, 2008, and March 12, 2009, that exceeded or was less than the amount he owed for the remaining children. Based on the court's consideration of Stacey's income as of June 2008, the court calculated that Stacey owed $17,199 but had paid only $10,129; thus, the court found Stacey in arrears for $7070.

On appeal, Stacey argues that the court improperly modified his support obligation retroactively, contending that *Ward v. Doss, supra*, is inapplicable and that the court clearly erred in calculating "retroactive" child support prior to the date on which Carol filed the motion for modification of support.

In *Ward v. Doss*, Shelby and Teresa Ward divorced on January 9, 1996, and

Teresa was awarded custody of the couple's three children. Shelby was ordered to make biweekly child-support payments of $220. On August 7, 2003, Shelby filed a motion requesting a change of custody for one daughter and a cancellation of child support for the oldest daughter, who had turned eighteen on September 11, 2002, and had graduated from high school. *Ward,* 361 Ark. at 158, 205 S.W.3d at 769. On September 17, 2003, Shelby filed a motion for abatement of child support and set-off, seeking retroactive credit for child support paid for the oldest daughter after she turned eighteen. *Id.* The trial court denied his request for retroactive modification of support, and Shelby appealed. *Id.*

On appeal, the supreme court held that Shelby's obligation to pay child support for the oldest child terminated by operation of law when she turned eighteen pursuant to Ark.Code Ann. § 9–14–237.[2] The court noted that the statute terminates the obligation to support a child under its terms without any action on the part of the obligor. *Ward,* 361 Ark. at 161, 205 S.W.3d at 772. Thus, the court concluded that

> Shelby's obligation to pay child support for [the oldest child] expired by operation of law on September 11, 2002, when [she] turned eighteen years old and had graduated from high school. However, Shelby's duty to provide child support for [the other two children] remained. We must reverse and remand this issue for the circuit court to *recalculate child support due under the then-applicable Family Support Chart* [for those two children] *as of [the oldest child's] eighteenth birthday on September 11, 2002, taking into account Shelby's income as of that date.*

*Id.* at 162, 205 S.W.3d at 772–73 (emphasis added).

The circuit court in the instant case specifically referenced this language in making its calculations and reaching its conclusions. Nonetheless, Stacey argues that the court's actions constituted an impermissible "retroactive modification" of child support. In support of his argument, he cites *Yell v. Yell,* 56 Ark.App. 176, 939 S.W.2d 860 (1997), in which it was held that, absent a specific finding of fraud in procuring an existing support finding, it is an abuse of discretion to impose a retroactive modification-of-support order beyond the filing date of a petition to modify. *Yell,* 56 Ark.App. at 179, 939 S.W.2d at 862.

*Yell,* however, is distinguishable. In that case, the mother (Elizabeth) and father (Garry) had an agreement, incorporated into an August 10, 1988 order modifying their divorce decree, that Elizabeth would obtain primary custody of their child, but Garry would gain significantly expanded visitation rights and would no longer have to pay child support. On June 14, 1994, Elizabeth filed a petition to modify the August 10, 1988 order such that she would begin receiving child-support payments again. The court granted her motion and ordered Garry to pay child support retroactively to 1991, the year Elizabeth resumed full custody of their child. *Id.* at 177–78, 939 S.W.2d at 861–62.

On appeal, Garry argued that the trial court erred in retroactively imposing a financial obligation for support prior to the date of filing of the petition for modifica-

---

**2.** The statute provides that "[u]nless a court order for child support specifically extends child support after these circumstances, an obligor's duty to pay child support for a child shall automatically terminate by operation of law ... [w]hen the child reaches eighteen (18) years of age unless the child is still attending high school." Ark.Code Ann. § 9–14–237(a)(1)(A)(i) (Repl.2009).

tion. This court agreed, holding that retroactive modification of a court-ordered support obligation may be assessed only from the time that a petition for modification is filed. *Id.* at 178, 939 S.W.2d at 862.

Here, however, the circuit court did not act on a petition for modification; rather, when confronted with Stacey's request for an order providing for an automatic reduction in child support, the court properly acknowledged that the support obligation needed to be adjusted to reflect the fact that Stacey no longer owed support for his oldest child. Having done that, the court then—pursuant to the supreme court's guidance in *Ward v. Doss*—recalculated the support for the remaining children as of the date that the oldest child turned eighteen, "taking into account [Stacey's] income as of that date." *Ward*, 361 Ark. at 162, 205 S.W.3d at 773. The circuit court correctly applied case law from our supreme court that was entirely on point; accordingly, we conclude that the circuit court did not abuse its discretion.

In his second point on appeal, Stacey argues that the circuit court erred when it refused to order the sale of the marital home on the grounds that, by having her child by another man live with her, Carol had "move[d] another person into the marital home." As noted, the Agreement provides that the marital home was to be sold if Carol should "remarry, live with another person, or move another person into the marital home on or prior to May of 2013." The circuit court found that Carol's year-and-a-half-old child was not " 'another person' as contemplated by the provision moving another person into the marital home." On appeal, Stacey argues that the plain and ordinary meaning of "another person" includes a child.

This argument requires us to construe the language of the Agreement. The first rule of interpretation of a contract is to give the language employed the meaning that the parties intended. *First Nat'l Bank v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992); *Cook v. Cook*, 2010 Ark. App. 758, 378 S.W.3d 275. It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words or phrases, but from the whole context of the agreement. *Griffin*, 310 Ark. at 170, 832 S.W.2d at 819. We must look to the contract as a whole and the circumstances surrounding its execution to determine the intention of the parties. *Id.* at 170, 832 S.W.2d at 820. Further, in determining the true intentions of the parties, different clauses of a contract must be read together and construed so that all of its parts harmonize if that is possible. *Harris v. Harris*, 82 Ark.App. 321, 107 S.W.3d 897 (2003); *Dodson v. Dodson*, 37 Ark.App. 86, 825 S.W.2d 608 (1992).

Here, Stacey argues that "person" means "person," and thus, bringing a child, who is a person, home from the hospital into the previous marital home triggered the sale clause of the Agreement. Stacey's argument fails to consider the context of the Agreement as a whole. In particular, a different provision of the Agreement provides that alimony and spousal support were to be eliminated in the event that Carol should "remarry, live with another *man*, or move another *man* into the marital home." (Emphasis added.) Thus, construing the contract as a whole, we can glean that the intent behind using the word "person" in the earlier provision concerning the home was meant to address the concern that Carol might bring "another man" into the marital home. Accordingly, we cannot say that the circuit court abused its discretion in finding that Carol's decision to raise her new baby in her home did not trigger the

sale provision in the "Property" portion of the Agreement.

For his third argument, Stacey contends that the circuit court erred when it declined to grant a deviation from the child-support chart for educational expenses. In its order, the circuit court denied Stacey's request to give him an accounting credit or offset the expenses of the children's private-school education. Stacey argued below that, under Arkansas Supreme Court Administrative Order No. 10, educational expense is a relevant factor in determining child support and in deviating from the Family Support Chart. The court rejected Stacey's motion because "[e]ducational expense was a matter that was part of the independent agreement or contract thoroughly negotiated and entered into by the parties in 2005, and the court declines to grant a deduction from net pay for that expense." The court specifically stated, however, that it did take that expense into consideration by discounting Stacey's income.

On appeal, Stacey argues that the court erred in so finding because the "parties' independent agreement regarding school expenses is irrelevant to the request for deviation." He relies on language in this court's opinion in *Hyden v. Hyden,* 85 Ark.App. 132, 148 S.W.3d 748 (2004), to the effect that the courts "will not countenance requiring the noncustodial parent to pay any more [in educational expenses] than the chart amount requires." Stacey's argument is without merit.

In *Hyden,* the trial court entered an order that directed the father to pay child support of $1430 per month as well as $1221 in alimony. The order also provided that, if the couple's child attended high school in Little Rock, all costs were to be paid by the mother. If, however, the child went to a military academy in Virginia, each party was to pay one-half of all ex-

penses. The father's child-support obligation would be suspended and abated during any academic year that the child went to the military academy. *Hyden,* 85 Ark.App. at 136, 148 S.W.3d at 750. The child began attending the military academy in the fall of 2002, after the father had filed a petition to modify the child-support arrangement in April 2002. The court entered an order in January 2003, finding that both parents were obligated to pay one-half of the expenses associated with the child's attending the military academy and terminating the father's $1430–per–month child-support obligation as of April 2002. In addition, the court ordered the mother to pay $536 per month in child support (as the child had moved into the father's house) and to pay child support during the months when her child-support obligation would otherwise have been abated (i.e., during the academic years when the child was attending school in Virginia). *Id.* at 136–37, 148 S.W.3d at 750.

In so doing, the trial court found that the provision in the previous order regarding the military academy was "in the nature of [child] support," and thus the court believed it could modify that order. The court found, however, that to modify the previous order of "support," there would have to be a material change in circumstances, which the court did not believe had been demonstrated. *Id.* at 137–38, 148 S.W.3d at 751. Thus, the court concluded that it would not modify the previous order of "support," and the mother appealed.

On appeal, this court noted that it was not clear whether the "equal sharing" provision concerning the expenses associated with the military academy was "set by the court or included by agreement of the parties." *Id.* at 139, 148 S.W.3d at 752. If the provision was by agreement of the parties, the court noted that, while independent contracts dealing with child sup-

port may be binding upon the parties, they are not binding upon the trial court. *Id.* Therefore, this court found that regardless of whether the order "represented a contractual agreement of the parties, the trial court was authorized to adjust child support upon a showing of changed circumstances." *Id.* at 140, 148 S.W.3d at 752. The court went on to find that there had been a material change in circumstances and therefore concluded that the circuit court erred in finding that it had no authority to modify the July 2001 order. *Id.,* 148 S.W.3d at 753.

This court went on to note that the trial court had specifically pointed out that the mother could not afford to pay one-half of the expenses associated with sending the child to military school. *Id.* at 141, 148 S.W.3d at 753. Against that backdrop, this court stated the following:

> It is a matter within the custodial parent's right to send or to continue to send his child to any particular school. However, if he chooses to continue sending the child to a $24,000 per year school, he should not expect and we should not countenance requiring the noncustodial parent to pay any more than the [child-support] chart requires. Any school expenses in excess of the child support paid by [the mother] to [the father] will be the [father's] responsibility, as it was his or his son's decision to incur the substantially increased expenses to attend [the military academy].

*Id.* at 141–42, 148 S.W.3d at 754.

Thus, *Hyden* does not stand for the proposition for which Stacey cites it. The case does not unambiguously hold that a settlement agreement, in which the parties agree that one party should be responsible for educational expenses, is never binding on the parties to the extent that such provision is "in the nature of support." Rather, on the facts presented in that case, the reviewing court simply did not disagree with the trial court that the agreement to pay educational expenses was "in the nature of support."

Here, on the other hand, the trial court made a specific finding that Stacey's agreement to pay educational expenses was part of a fully negotiated contractual agreement that the court declined to disturb. There was no finding—and there is no genuine argument on appeal—that the contractual provision to pay educational expenses was "in the nature of support" that should have been counted as supporting a deviation from the child-support chart. Accordingly, we conclude that the circuit court did not abuse its discretion in declining to find that Stacey's contributions to the children's educational expenses warranted a deviation from the child-support chart.

In what is actually Stacey's final point on appeal, Stacey urges that, in the event this court affirms the circuit court's application of *Ward v. Doss,* the circuit court nonetheless erred in "failing to consider" Stacey's request for a deviation for purposes of calculating child support for payment of private-school tuition and expenses. He quotes a sentence from *Ward,* which stated that, in recalculating support in that case, the trial court's

> order must provide the court's determination of the payor's income, reciting the amount of support required under the guidelines, and reciting whether the court has deviated from the Family Support Chart as well as, in the case of a variance from the Chart, a justification of why the order varies as permitted under the statute.

*Ward,* 361 Ark. at 163–64, 205 S.W.3d at 773.

This argument is little more than a rehashing of Stacey's complaint that the court did not grant him a deviation for the educational expenses he was ordered to pay. As discussed above, however, the

circuit court correctly found that the payment of educational expenses was a matter governed by the independently negotiated contract between the parties. This was clearly a matter that was considered and addressed by the court. Therefore, this argument presents no basis for reversal.

Finally, Stacey contends that the circuit court erred in awarding attorney's fees to Carol. At the conclusion of its letter opinion, the circuit court awarded Carol $2500 in attorney's fees. Stacey argues that the circuit court's award of attorney's fees was in error because Carol's attorney failed to move for attorney's fees at trial.[3] Stacey also complains that, while Carol testified that she had not paid her attorneys, there was neither testimony that she had been billed by her attorneys for the services nor evidence presented of specific fees or costs that were incurred.

We find merit in Stacey's second argument. The circuit court has the inherent power to award attorney's fees in domestic-relations proceedings, and whether the circuit court should award fees and the amount thereof are matters within the discretion of the circuit court. *Stout v. Stout*, 2011 Ark. App. 201, at 10, 378 S.W.3d 844, 850; *Miller v. Miller*, 70 Ark. App. 64, 14 S.W.3d 903 (2000). In awarding attorney's fees, the circuit court may use its own experience as a guide and can consider the types of factors set forth in

*Chrisco v. Sun Industries, Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990).[4] The court need not, however, conduct an exhaustive hearing on the amount of attorney's fees because it has presided over the proceedings and gained familiarity with the case and the services rendered by the attorney. *Stout, supra; Paulson v. Paulson*, 8 Ark. App. 306, 652 S.W.2d 46 (1983).

In the case at bar, however, the trial court awarded attorney's fees without any discussion whatsoever and without providing any pertinent analysis of the *Chrisco* factors. If a trial court fails to consider the *Chrisco* factors when awarding attorney's fees, we will reverse and remand for the trial court to make such an analysis. *Stout, supra; see also Bailey v. Rahe*, 355 Ark. 560, 142 S.W.3d 634 (2004); *S. Beach Beverage Co. v. Harris Brands, Inc.*, 355 Ark. 347, 138 S.W.3d 102 (2003). Because there is no evidence that any such analysis took place in this case, we reverse and remand the fee award for proper consideration of the *Chrisco* factors.

Affirmed in part; reversed and remanded in part.

PITTMAN and ABRAMSON, JJ., agree.

3. Stacey is wrong that Carol never specifically sought attorney's fees. In the May 21, 2009 amendment to her counterpetition for modification of the Agreement, Carol stated that she was "without funds to pay for attorney fees or expenses of litigation. Her attorney has received no retainer and is paying all out-of-pocket expenses. Carol requests the court to award [her] attorney ... a reasonable fee for services and cost of litigation." Moreover, Carol testified without objection that she had not paid her attorneys.

4. The *Chrisco* factors that may be considered by the trial court are (1) the experience and ability of the attorney; (2) the time and labor required to perform the legal services properly; (3) the amount involved in the case and the results obtained; (4) the novelty and difficulty of the issues involved; (5) the fee customarily charged in the locality for similar legal services; (6) whether the fee is fixed or contingent; (7) the time limitations imposed upon the client or by the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.