2012 Ark. App. 483
**Betty TINER, Appellant**
v.
**William Joe "Bill" TINER, Appellee.**
**No. CA 11–1175.**

Court of Appeals of Arkansas.

Sept. 12, 2012.

Satterfield Law Firm, PLC, by: G. Randolph "Randy" Satterfield, Little Rock and Laura E. Levine, for appellant.

Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., by: Traci LaCerra, North Little Rock and Mary Claire McLaurin, for appellee.

DOUG MARTIN, Judge.

This is appellant Betty Tiner's second appeal to this court in her efforts to enforce a property settlement agreement that was incorporated into a divorce decree, in which appellee William Joe ("Bill") Tiner agreed to pay Betty a lump sum of $400,000 in exchange for Betty's one-half interest in real property and assets belonging to the couple's business, Benton Transmission. On remand from this court, the circuit court found Bill in contempt for failing to abide by the agreement's terms, for which the circuit court purported to provide two remedies: (1) the circuit court granted Betty judgment for the balance owed by Bill for Betty's one-half interest in the parties' business assets, and (2) the circuit court ordered Bill to pay the judgment in $3,000 monthly payments until the judgment with interest is paid in full, along with other financial obligations that are not the subject of this appeal.[1] Betty rais-

---

1. As a general proposition, contempt may not be used to compel payment of a money judgment. *See* 17 C.J.S. *Contempt* § 15 (1999); 50 C.J.S. *Judgments* § 694 (1997). *But see Gould v. Gould,* 308 Ark. 213, 823 S.W.2d 890 (1992) (holding that failure to pay attorney's fee reduced to judgment in divorce case may be subject to contempt citation). However, no objection to the circuit court's attempt to enforce a money judgment through its contempt power was raised before the circuit court, nor is it argued on appeal.

es two arguments on appeal: (1) the circuit court erred in modifying the parties' property settlement agreement, which provided for payment in a lump sum, as opposed to monthly installments, and (2) the circuit court failed to consider and discuss all of the relevant factors in awarding an attorney's fee. We agree with Betty on the first point, and therefore reverse and remand. As for Betty's second point, we overrule our decision in *Stout v. Stout,* 2011 Ark. App. 201, 378 S.W.3d 844, and affirm the award of attorney's fees.

## I. *Property Settlement Agreement*

Paragraph three of the "First Amended and Substituted Decree of Absolute Divorce," provides:

> The parties were sworn, listened to the terms of their agreement property settlement agreement [sic] as it was read into the record of this Court in each of their, their counsels [sic], presence, and then both Plaintiff and Defendant testified, under oath, that they understood all the terms of their agreement and that the terms of the agreement were contractual, that neither party was being forced into, or entering into the same under duress, but it was a voluntary undertaking which they each requested the Court to approve to forever settle all of their marital property rights and allocation of marital debt.

In the following paragraph, under the heading "Property Settlement Agreement," the decree provides:

> 4. The Court now, having reviewed the terms of the parties' property settlement agreement which is set-forth below, which forever settles the respective rights and claims of each party in and to property and other matters, hereby finds the same to be fair and equitable, that it should be approved and confirmed....

A section entitled "Property Settlement Consideration" provides:

> 9. In consideration for the transfer and conveyance to Defendant William Tiner of Plaintiff Betty Tiner's one-half (½) interest in the above described marital real property and Benton Transmission assets, Defendant William Tiner agrees to pay Plaintiff Betty Tiner, who agrees to accept, a bargained for specific sum for property settlement in exchange for all of Plaintiff Betty Tiner's right, title and interest in all the parties' real property and Benton Transmission assets. This specific total sum is **FOUR HUNDRED THOUSAND DOLLARS ($400,000.00)**; subject to, and conditioned upon, the Defendant William Tiner timely paying the above lump sum property settlement funds on of [sic] before July 16, 2009, which is thirty (30) days from date of the final divorce hearing.

> . . . .

> That the Plaintiff Betty Tiner specifically retains title and ownership in the aforementioned real estate assets, as tenant-in-common by operation of law, until she receives full and timely payment of $400,000.00 lump sum portion of her property settlement funds she is due under this agreement. Upon Defendant William Tiner's full and timely payment of all the above described lump sum property settlement funds, Plaintiff Betty Tiner shall grant, convey, and transfer, by Quitclaim Deed, all of her right, title, equity, and interest in the parties' real properties described above, and any and all other documents necessary to transfer those real estate and Benton Transmission assets to Defendant William Tiner, or any other designated person or entity as he may direct.

> . . . .

> **IT IS FURTHER ORDERED** that the Property Settlement Agreement refer-

enced above is incorporated by reference herein and is adopted by this Court, but not merged into this Decree; and the parties are ordered to abide by the terms of said Property Settlement Agreement.

(Emphasis in original.)

## II. *Background*

The following is a brief discussion of what occurred with regard to Betty's first appeal to this court in *Tiner v. Tiner,* 2011 Ark. App. 478, 385 S.W.3d 326. The final divorce decree, setting forth the above terms of the parties' property settlement agreement was entered on July 29, 2009. On October 19, 2010, Betty moved to enforce the decree, for contempt sanctions, and for a writ of immediate execution. The circuit court initially granted the writ of execution on Bill's one-half interest in Benton Transmission, but, on October 22, 2010, the circuit court granted Bill's emergency motion to set aside the writ. On October 27, 2010, Betty filed a motion requesting that the circuit court reconsider its ruling setting aside the writ of execution. The circuit court, however, in a letter opinion dated November 4, 2010, declined to modify its October 22, 2010 order and noted that the parties would have the opportunity at a future hearing to present arguments as to how the circuit court should enforce the terms of the property settlement agreement.

At a hearing held on November 8, 2010, Bill admitted that he had agreed to pay Betty $400,000 in a lump sum according to the terms of the property settlement agreement, yet he did not make that payment. Bill testified that he was scheduled to close on a loan through which he was to borrow the money to pay the lump sum. Instead of closing on that loan, however, Bill filed for bankruptcy. According to Bill, he "got thrown out [of bankruptcy court.]" Bill claimed that, since that time, he attempted to borrow money to pay the lump sum but had been turned down by several banks. Bill testified that Benton Transmission earned a profit of $800,000 in 2009 and over $415,000 only six months into 2010. Bill further testified that he understood that he entered into a contract with Betty in the divorce proceedings and agreed to pay a lump sum but that he was requesting that the circuit court change the parties' contract. Bill stated that, if the court were to permit him to pay the lump sum on a monthly basis, "$2,000 wouldn't be a problem."

Betty testified that she was married to Bill for over seventeen years. Betty testified, "I do not trust [Bill]. I want all of [the lump sum] at one time so I can put closure to two and a half years of misery that he has put me through."

From the bench, the trial judge expressed his concern about ordering that all of Bill's property be sold to satisfy his obligation to pay the lump sum or incarcerating Bill until he pays the lump sum. The trial judge did not think either option was "a good idea" because he "would be putting the future obligations of Mr. Tiner towards Ms. Tiner at risk and I would be bankrupting Mr. Tiner." The trial judge, however, found that "there is probably a much greater ability to pay [on Bill's part] than what has been stated from the stand." The trial judge then ordered Bill to pay, among other things, $3,000 per month until the remainder of the lump sum, $349,286, is paid in full.

On November 22, 2010, Betty filed a notice of appeal from the circuit court's order dated October 22, 2010, as well as the oral rulings issued from the bench at the November 8, 2010 hearing, for which an order had not yet been entered. Betty lodged the record on appeal with this court on December 21, 2010. On January 14, 2011, the circuit court entered a judgment

ordering payment as prescribed in its oral ruling from the bench.

In our opinion in *Tiner, supra,* delivered on June 29, 2011, this court affirmed the circuit court's decision setting aside Betty's writ of execution, albeit on a different basis than that on which the circuit court relied. This court held that there was no judgment upon which to execute, in that the property settlement agreement was an independent contract between the parties and not a judgment, which required language clearly specifying the relief that was granted after determination and inquiry. This court then dismissed Betty's appeal with respect to the judgment that was subsequently granted on January 14, 2011, because the circuit court lost jurisdiction to act once Betty lodged the record on appeal with this court.[2] This court was thus precluded from considering the merits of Betty's argument until now.

On August 9, 2011, Betty filed an amended motion to enforce the divorce decree, for contempt, and for an expedited order for an immediate writ of execution. A hearing was held on September 7, 2011, at which Betty testified as to additional instances of Bill's contempt and testified that, while Bill had timely paid the $3,000 installments, he did not pay the other amounts ordered such that Betty was in danger of having her assets seized. Also, Betty testified that Bill owed $365,561.93, as set forth in a document entitled "Plaintiff's Judgment Principal and Interest Calculations" that was introduced into evidence. On September 16, 2011, the circuit court held Bill in contempt for failing to abide by the terms of the property settlement agreement and ordered Bill to pay the balance of the lump sum in monthly installments of $3,000. The circuit court also awarded Betty a $500 attorney's fee.

On September 21, 2011, Betty filed a timely notice of appeal.

## III. *Enforcement of Property Settlement Agreement*

■ Betty argues that (1) the circuit court lacked authority to modify the parties' property settlement agreement from a lump-sum payment to monthly installments, (2) the modification was not a permissible exercise of the circuit court's contempt power because the sanction did not coerce Bill into complying with the agreement's provision that he pay $400,000 in a lump sum, and (3) the modification cannot be upheld under Arkansas Rule of Civil Procedure 60(c) (2011), which sets forth grounds for setting aside a judgment after the expiration of ninety days. We agree with Betty.

Arkansas Code Annotated section 9–12–313 (Repl.2009) provides:

> Courts of equity may enforce the performance of written agreements between husband and wife made and entered into in contemplation of either separation or divorce and decrees or orders for alimony and maintenance by sequestration of the property of either party, or that of his or her sureties, or by such other lawful ways and means, including equitable garnishments or contempt proceedings, as are in conformity with rules and practices of courts of equity.

■ Although we review equity cases de novo on the record, we do not reverse unless we determine that the circuit court's findings of fact are clearly erroneous. *Hill v. Hill,* 84 Ark. App. 132, 134 S.W.3d 6 (2003). A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on

**2.** *Myers v. Yingling,* 369 Ark. 87, 251 S.W.3d 287 (2007) (Once the record is lodged in the appellate court, the circuit court no longer exercises jurisdiction over the parties and the subject matter in controversy.).

the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Sanford v. Sanford,* 355 Ark. 274, 137 S.W.3d 391 (2003). We view the evidence in a light most favorable to the appellee, resolving all inferences in favor of the appellee. *Id.* However, a circuit court's conclusion on a question of law is given no deference on appeal. *Id.*

We hold that the circuit court erred by ordering Bill to pay the lump sum in monthly installments because it resulted in an impermissible modification of the material terms of the parties' property settlement agreement. It is well established that, when parties enter voluntarily into an independent property settlement agreement that is incorporated into a decree of divorce, it cannot subsequently be modified by the court. *Gentry v. Gentry,* 327 Ark. 266, 938 S.W.2d 231 (1997). Property settlement agreements, especially after approval by a trial court, are considered binding and final contracts between the parties. *See Brewer v. Brewer,* 239 Ark. 614, 390 S.W.2d 630 (1965).

The property settlement agreement clearly provides that each party was represented by counsel, that the parties understood the agreement's terms and realized the terms were contractual, that neither party had been forced into the agreement, and that both parties entered into the agreement voluntarily. Moreover, the circuit court found that the agreement was "fair and equitable" and thereafter approved and confirmed it. Bill agreed to pay Betty $400,000 in a lump sum, and the circuit court could not thereafter modify the terms of the agreement by ordering Bill to pay the lump-sum amount in monthly installments. The fact that Bill entered into an agreement that later appeared improvident to him is no ground for relief. *See, e.g., Helms v. Helms,* 317 Ark. 143, 875 S.W.2d 849 (1994) (citing *Armstrong v. Armstrong,* 248 Ark. 835, 454 S.W.2d 660 (1970)); *McGinnis v. McGinnis,* 268 Ark. 889, 597 S.W.2d 831 (Ark.App.1980).

According to Bill, "[s]pecific performance of the lump sum provision was no longer feasible, as the time for such performance had passed." Bill contends that the court therefore exercised its power of contempt by entering an order that "was designed to coerce the compliance of the Appellee because he could easily rid himself of the additional monthly payments and accruing interest—if he satisfied the agreement by paying Appellant in full."

In *Evans v. Evans,* 92 Ark. App. 170, 211 S.W.3d 584 (2005), upon which Bill relies, this court held that the circuit court's refusal to lower appellant's alimony payments was a proper exercise of its contempt powers. The property settlement agreement in *Evans,* dated December 18, 2000, and incorporated into the divorce decree, ordered appellant to pay appellee $5,000 per month. The agreement provided that appellee acknowledged that appellant planned to become a medical missionary and agreed that, despite any economic hardship it caused her, appellant's alimony payments would be reduced to $1,000 during the months that appellant lived outside of the United States. Upon his return to the United States, appellant would resume paying $5,000 per month. In August 2001, appellant was found in contempt for failing to pay alimony and meet other financial obligations and was ordered to pay appellee, among other sums, $100,000, plus interest, relating to the sale of the parties' marital residence. The court also ordered appellant to surrender his passport and warned him not to apply for a duplicate passport until he paid the money he owed to appellee. In January 2002, appellee again requested that appellant be held in contempt. The matter was not heard until May 2004, at which time appellant contended that his alimony payment de-

creased to $1,000 per month in January 2002 when he began living outside of the United States. Appellant, however, admitted that he had obtained a duplicate passport and left the United States on December 30, 2001, and practiced in the Philippines as a medical missionary. The circuit court found appellant in contempt and, in calculating the alimony arrearage, the circuit court concluded that appellant was not entitled to the reduction of alimony, given that his departure from the United States was in direct violation of the circuit court's order. On appeal to this court, appellant argued that the circuit court erred in modifying the property settlement agreement by ordering him to pay $5,000 per month, instead of $1,000 per month, during the time that he worked as a medical missionary outside of the United States. This court held that the circuit court's refusal to reduce appellant's alimony payments while overseas was a valid exercise of the circuit court's contempt power for violating its order restricting travel until appellant satisfied his financial obligations to appellee.

The *Evans* case is distinguishable from the present case in that the appellant in *Evans* would have paid $5,000 per month, in accordance with the property settlement agreement, if he had not violated the circuit court's order. Whereas the circuit court in *Evans* punished the appellant for his violation of its orders, the circuit court in the present case alleviated Bill's burden by ordering him to pay monthly installments instead of the lump sum agreed upon pursuant to the parties' property settlement agreement. In *Williams v. Ramsey*, 101 Ark. App. 61, 270 S.W.3d 345 (2007), this court distinguished between civil and criminal contempt:

> Contempt is divided into criminal contempt and civil contempt. Criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. Civil contempt, on the other hand, protects the rights of private parties by compelling compliance with orders of the court made for the benefit of private parties. This court has often noted that the line between civil and criminal contempt may blur at times. Our Court of Appeals has given a concise description of the difference between civil and criminal contempt. ("Criminal contempt punishes while civil contempt coerces.") In determining whether a particular action by a judge constitutes criminal or civil contempt, the focus is on the character of relief rather than the nature of the proceeding. Because civil contempt is designed to coerce compliance with the court's order, the civil contemnor may free himself or herself by complying with the order. This is the source of the familiar saying that civil contemnors "carry the keys of their prison in their own pockets." Criminal contempt, by contrast, carries an unconditional penalty, and the contempt cannot be purged.

*Williams*, 101 Ark. App. at 65–66, 270 S.W.3d at 348–49 (internal citations omitted) (quoting *Ark. Dep't of Health & Human Servs. v. Briley*, 366 Ark. 496, 499–500, 237 S.W.3d 7, 9–10 (2006)).

The circuit court's order in the present case neither punishes nor coerces Bill to comply with the property settlement agreement's provision for a lump-sum payment to Betty. Rather, the order grants Bill relief from his contractual obligations under the agreement. To the extent that the circuit court characterizes its action as contempt for which Bill could purge himself, the circuit court's action is invalid because it impermissibly modifies the terms of the parties' property settlement agreement. Accordingly, we reverse that aspect of the circuit court's judgment that provides that Bill may pay the $349,286 in monthly installments, as opposed to the lump sum that was agreed upon.

■ As noted, the circuit court also purported to grant judgment to Betty for the unpaid balance of the $400,000 Bill originally agreed to pay. However, the amount of the judgment set by the circuit court was "the sum of $349,286.00 (as of November 7, 2010)." The circuit court's precedent was not entered until September 16, 2011, ten months after November 7, 2010. There was uncontroverted evidence introduced after remand at the September 7, 2011 hearing that Bill had made payments to Betty on this indebtedness after November 7, 2010, |₁₂and that interest had accrued in the interim. A judgment should be expressed in a sum certain so that execution may issue. Ark.Code Ann. § 16–66–101 (Repl.2005); 49 C.J.S. *Judgments* § 86 (1997). We hold that Betty is entitled to a money judgment, however, because the present judgment is deficient, we remand this matter for the circuit court to enter an appropriate judgment for a sum certain.

### IV. *Award of Attorney's Fees*

■ Betty sought approximately $20,000 in attorney's fees, and the circuit court awarded Betty $5,000, followed by an additional $500. In arguing that she should have received a greater award, Betty contends that the circuit court erred in not considering and discussing the factors set forth in *Chrisco v. Sun Indus., Inc.,* 304 Ark. 227, 800 S.W.2d 717 (1990).[3] According to Betty, the circuit court's award

must be reversed and remanded pursuant to our decision in *Stout, supra.* In *Stout,* this court reversed and remanded an award of attorney's fees because "the trial court awarded attorney's fees without any discussion whatsoever and without providing any pertinent analysis of the *Chrisco* factors." *Stout,* 2011 Ark. App. 201, |₁₃at 11, 378 S.W.3d at 850–51. Upon further reflection on the matter, we hold that our decision in *Stout* must be overturned.

■ *Stout,* a domestic-relations case, relies on three Arkansas Supreme Court cases to support the proposition that the circuit court must provide "evidence" of its consideration and analysis of the *Chrisco* factors. Those cases, however, are readily distinguishable from *Stout* in that none involved domestic-relations proceedings. The cases relied upon by *Stout* involve entitlement to statutorily mandated attorney's fees and exceptions to the American Rule.[4] *See Bailey v. Rahe,* 355 Ark. 560, 142 S.W.3d 634 (2004) (involving guardianship proceedings and Arkansas Code Annotated section 28–65–319's provision that an attorney's fee shall be allowed as an item of the expense of administration); *S. Beach Beverage Co. v. Harris Brands, Inc.,* 355 Ark. 347, 138 S.W.3d 102 (2003) (involving the Franchise Act and Arkansas Code Annotated section 4–72–208's provision that any franchisee who is harmed by violations of the Act shall be entitled to recover treble damages and, where appro-

---

**3.** *Chrisco* provides that, "although there is no fixed formula in determining the computation of attorney's fees, the courts should be guided by recognized factors in making their decision, including the experience and ability of the attorney, the time and labor required to perform the legal service properly, the amount involved in the case and the results obtained, the novelty and difficulty of the issues involved, the fee customarily charged in the locality for similar legal services, whether the fee is fixed or contingent, the time limitations imposed upon the client or by the cir-

cumstances, and the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer." *Chrisco,* 304 Ark. at 229, 800 S.W.2d at 718–19.

**4.** Arkansas has long followed the "American Rule" that attorney's fees are not chargeable as costs in litigation unless specifically permitted by statute or rule. *Gill v. Transcriptions, Inc.,* 319 Ark. 485, 892 S.W.2d 258 (1995).

priate, obtain injunctive relief in addition to reasonable attorney's fees and costs of litigation); *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002) (involving the common-fund and common-benefit exceptions to the American Rule).

In *Lake View*, a school-funding case, our supreme court recognized that the *Chrisco* factors applied, after determining that attorney's fees were appropriate where the State had waived sovereign immunity. *Lake View*, however, was a self-described "unique case with a ₁₄unique set of circumstances." *Lake View*, 351 Ark. at 96, 91 S.W.3d at 510. In *Bailey* and *South Beach Beverage*, both of which relied in part on *Lake View*, our supreme court reversed and remanded an attorney's fee award and required the circuit court to analyze the *Chrisco* factors. At this time, we understand those three cases to be limited in application to the particular subject matters involved, i.e., school funding, guardianship proceedings, and cases involving the Franchise Act. To the extent these cases can be interpreted to require specific findings relating to a circuit court's consideration of awarding attorney's fees,

we decline to extend their holdings with respect to the *Chrisco* factors into domestic-relations cases.

In *Stout*, this court noted the lack of any "evidence" that the circuit court had analyzed the *Chrisco* factors, which we held required that the case be remanded to the circuit court for proper consideration. Our decision in *Stout* essentially makes specific findings, written or oral, mandatory when awarding attorney's fees in domestic-relations proceedings and requires that we summarily reverse and remand when an award lacks such findings. We note that Arkansas Rule of Civil Procedure 52 (2011) provides an avenue for requesting specific findings.[5] Betty requested no such findings from the circuit court. The circuit court is certainly permitted and encouraged to consider the types of factors listed in *Chrisco, supra,* as well as such factors set forth in *Robinson v. Champion*, 251 Ark. 817, 475 S.W.2d 677 (1972),[6] and the financial abilities of the parties,[7] but this court will not, on its own motion, require the circuit court to make specific findings in domestic-relations cases. As a practical matter, this court would impose a considerable burden on the circuit court if

---

**5.** Rule 52(a) (2011) provides that, if requested by a party at any time prior to entry of judgment, in all contested actions tried upon the facts without a jury, the court shall find the facts specially. Subsection (b) provides that, upon motion of a party made not later than ten days after entry of judgment, the court may amend its findings of fact or make additional findings. Ark. R. Civ. P. 52(b).

**6.** *Robinson,* a divorce case, recognized that, among the pertinent considerations in determining the amount of attorney's fees are the attorney's judgment, learning, ability, skill, experience, professional standing; the relationship between the parties; the amount or importance of the subject matter of the case; the nature, extent and difficulties of services in research, collection, estimation, and mental array of evidence and anticipation of defenses and means of meeting

them; considering the case, receiving of confidential information and giving of confidential advice before any pleadings are filed or other visible steps are taken; the preparation of pleadings; the proceedings actually taken and the nature and extent of litigation; the difficulties presented in the course of the litigation; the results obtained; and many other factors besides the time visibly employed. *Robinson,* 251 Ark. at 818–19, 475 S.W.2d at 678. *See also Paulson v. Paulson,* 8 Ark. App. 306, 311, 652 S.W.2d 46, 49 (1983).

**7.** *See Davis v. Williamson,* 359 Ark. 33, 194 S.W.3d 197 (2004) (noting that the factors in *Paulson* are very similar to those set forth in *Chrisco,* with one exception—the financial abilities of the parties are also considered in the context of domestic-relations cases).

we required that specific findings be made when awarding attorney's fees, given the myriad of factors to be considered.

▮ Further, this court's standard of review supports our decision to overrule *Stout*. In domestic-relations proceedings, the circuit court has the inherent power to award attorney's fees, and whether the circuit court should award fees and the amount thereof are matters within the circuit court's discretion. *Miller v. Miller*, 70 Ark. App. 64, 14 S.W.3d 903 (2000). When addressing a circuit court's award of attorney's fees, our courts have often observed that there is no fixed formula in determining what is reasonable. *Swink v. Lasiter Constr., Inc.*, 94 Ark. App. 262, 229 S.W.3d 553 (2006). The *Stout* court recognized that "the circuit court may use its own experience as a guide and *can consider* the types of factors set forth in *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990)." *Stout*, 2011 Ark. App. 201, at 11, 378 S.W.3d at 850 (emphasis added). A court need not, however, conduct an exhaustive hearing on the amount of attorney's fees because it has presided over the proceedings and gained familiarity with the case and the services rendered by the attorney. *Paulson v. Paulson*, 8 Ark. App. 306, 652 S.W.2d 46 (1983). Further, we have not strictly required documentation of time and expense in a divorce case where the trial court has had the opportunity to observe the parties, their level of cooperation, and their obedience to court orders. *Deaton v. Deaton*, 11 Ark. App. 165, 668 S.W.2d 49 (1984). Due to the trial judge's intimate acquaintance with the record and the quality of service rendered, we usually recognize the superior perspective of the trial judge in assessing the applicable factors. *Chrisco, supra*. Accordingly, an award of attorney's fees will not be set aside absent an abuse of discretion. *Id*. An abuse of discretion occurs when discretion is applied thoughtlessly, without due consideration, or improvidently. *Payne v.*

*Donaldson*, 2011 Ark. App. 467, 385 S.W.3d 296.

Without express authority from our supreme court, and, given this court's deferential standard of review of the circuit court's awarding of attorney's fees, we will not expand our supreme court's mandate, requiring reversal and remand for an analysis of the *Chrisco* factors, into the realm of domestic relations. Accordingly, we overturn *Stout* and its progeny, to the extent those cases require the circuit court to make written findings on and/or specific reference to the *Chrisco* factors in awarding attorney's fees in domestic-relations cases. *See, e.g., Clowers v. Stickel*, 2012 Ark. App. 346, 414 S.W.3d 396; *Gillison v. Gillison*, 2011 Ark. App. 244, 382 S.W.3d 795; *Szabo v. Womack*, 2011 Ark. App. 664, 2011 WL 5220503.

Because Betty has failed to sustain her burden of proving that the circuit court abused its discretion, we affirm the award of attorney's fees.

Reversed and remanded in part; affirmed in part.

PITTMAN, ROBBINS, and HOOFMAN, JJ., agree.

ABRAMSON and BROWN, JJ., dissent.

RAYMOND R. ABRAMSON, Judge, dissenting.

While I agree with the majority's decision regarding the property settlement agreement, I must dissent because I do not believe that our decision in *Stout v. Stout*, 2011 Ark. App. 201, 378 S.W.3d 844, should be overturned. The majority has failed to demonstrate any logical reason to treat attorney's fee awards in domestic-relations cases differently than attorney's fee awards in other cases. Because there is no discernible, qualitative difference between domestic-relations cases and other civil cases for purposes of awarding attor-

ney's fees, I do not perceive any rational basis for treating this category of cases differently. The purpose of requiring a *Chrisco*[1] analysis is simply to provide the appellate courts with a basis upon which to provide a meaningful review of an award of fees. That purpose does not change based on the nature of the underlying action. Without some analysis of how the trial court reached its determination, the appellate court is effectively rendered unable to conduct a meaningful review of the trial court's decision. Ergo, it cannot know whether the trial court abused its discretion or applied any discretion at all.

The majority also contends that by requiring trial courts in domestic-relations cases to perform a *Chrisco* analysis, we are somehow expanding the supreme court's mandate. The supreme court has never held that the *Chrisco* factors are not applicable in domestic-relations cases. To the contrary, the supreme court in *Davis v. Williamson*, 359 Ark. 33, 194 S.W.3d 197 (2004), applied the *Chrisco* factors in a paternity action. In doing so, it noted that the *Chrisco* factors were similar to the factors set forth in *Paulson v. Paulson*, 8 Ark. App. 306, 652 S.W.2d 46 (1983),[2] with one exception—the financial ability of the parties should also be considered in domestic-relations cases. This is no different than the standard we set forth in *Stout*.

I also fail to see how the supreme court's silence on the necessity of a formal analysis of those factors in domestic-relations cases, while requiring it in other attorney's fee cases, constitutes a mandate. The majority's opinion, in effect, now requires appellants to request specific findings under Rule 52 in order to challenge a fee award in domestic-relations cases—something not previously required in domestic-relations cases—and which could it-

self be considered an expansion of the supreme court's mandate.

Nor do I find that it places an undue burden on the trial court. *Stout* does not require an exhaustive hearing on attorney's fees, nor does it require strict documentation of time and expenses by the attorneys in a divorce action. But it does require the trial court provide some basis upon which the reasonableness of the fee was determined so that a meaningful review may be performed. For these reasons, I would uphold *Stout* and remand for an analysis of the attorney's fee award.

I respectfully dissent.

BROWN, J., joins in this dissent.

---

**1.** *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990).

**2.** *Paulson* was a divorce/separate maintenance case.