SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–15–350

| | |
|---|---|
| THOMAS URAL FALLIN III<br>APPELLANT<br><br>V.<br><br>KATHY LEANNE FALLIN<br>APPELLEE | **Opinion Delivered** March 30, 2016<br><br>APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT<br>[NO. DR–12–136]<br><br>HONORABLE HAMILTON H. SINGLETON, JUDGE<br><br>AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

Thomas Ural Fallin III ("Tommy") appeals the Columbia County Circuit Court order enforcing a property-settlement agreement ("PSA") with his ex-wife, Kathy Leanne Fallin ("Leanne"). On appeal, Tommy argues that the circuit court erred in enforcing the PSA and awarding Leanne attorney's fees. We affirm.

Tommy and Leanne were married on November 23, 1985. On May 9, 2012, Leanne filed a pro se complaint for divorce. The complaint stated, "There are marital property rights and debts to be adjudicated by this [c]ourt. However, it is anticipated that Plaintiff and Defendant will reach an agreement as to the division of property and debts." Leanne also attached Tommy's entry of appearance and waiver of service of summons to the complaint. Paragraphs three and four of the waiver of service of summons state as follows:

> 3. I have reached an agreement with Plaintiff regarding all property and debt issues. Our agreement is contained in the Property Settlement Agreement that I have signed contemporaneously with this document.

4. I have had an opportunity to visit with an attorney prior to entering into my agreement with the Plaintiff, and fully understand the terms and effect of the agreement and decree.

On June 6, 2012, Tommy filed a withdrawal of his entry of appearance and a withdrawal of his waiver of service of summons. He stated that he desired to be represented by counsel and to be present at the final hearing. Also on June 6, Tommy's counsel filed an answer to Leanne's complaint for divorce and a counterclaim for divorce. In his answer, Tommy stated that "any attempts of settlement between the parties prior to the final hearing of this matter is inadmissible and should not be considered by th[e] [c]ourt."

On June 27, 2012, Leanne filed a motion to enforce the agreement and a motion for contempt. She alleged that she and Tommy had entered into a PSA on May 9, 2012, and she asked the court to enforce the agreement. She also asked the court to hold Tommy in contempt for selling the marital business, Fallin Tractor Company ("Fallin Tractor"), to his father and disposing of marital savings. She attached the PSA to her motion. The relevant paragraphs of the PSA provide the following:

1. PROPERTY AND DEBT SETTLEMENT

During the course of this marriage, the parties acquired various items of real and personal property and debts, and such items and debts are disposed of as follows:

Property
Property is awarded to each party as follows:

A. Real Estate

Commercial Property:
Wife shall be entitled to sole possession and ownership of 1010 North Dudney, Magnolia, AR 71753, more commonly known as the Fallin Professional Building. Wife shall be responsible for all debt thereon, and

2



shall indemnify and hold Husband harmless therefrom. Husband shall execute all documents necessary to effectuate this provision.

Marital Home:
Wife shall be entitled to sole possession and ownership of the marital home located at 1102 Hazel Circle, Magnolia, AR 71753. Wife shall be responsible for all debt thereon, and shall indemnify and hold Husband harmless therefrom. Husband shall execute all documents necessary to effectuate this provision. If remarriage occurs or home is sold then wife shall pay [$]80,000.00 to Husband for home at the time of sale.

B. Retirement Accounts and Pensions
Wife shall be entitled to sole ownership . . . in the following retirement accounts:
Ameriprise account ending 7004
Ameriprise account ending 9004
Plan Administrator: Candy Adams
Husband shall execute all documents necessary to effectuate this provision.

. . . .

D. Bank Accounts
Wife shall have sole possession of the following marital bank account(s):
Farmers Bank Checking Account (account ending 3025)
Husband shall have sole possession of the following marital bank account(s): NONE

E. Tangible Personal Property
The parties have divided all personal property, and each shall have ownership and possession of that property currently in their respective possession. Each party shall be responsible for any debts associated with personal property which they receive in this division. Wife and Husband agree to indemnify and hold each other harmless from any such debts.

F. Debts
Wife shall be responsible for the following debts:

REAL ESTATE DEBT:       Creditor
1010 North Dudney Suite
Fallin Professional Building
Magnolia, AR 71753       Farmers Bank and Trust
Wife agrees to pay off or refinance property loan as soon as [practicable].

SLIP OPINION

Wife shall be responsible for all other debts incurred solely in her name, as well as any debts associated with Physiques, Inc. and TLC of Magnolia, Inc.

Husband shall be responsible for the following debts:

| | Creditor |
|---|---|
| Credit Card | Chase |

Husband shall be responsible for all other debts incurred solely in his name, as well as any debts associated with Fallin Tractor, Inc.

G. Corporations

Husband and Wife have ownership interest in the following corporations: 1) Physiques, Inc.; 2) Fallin Tractor, Inc.; 3) TLC of Magnolia, LLC. The parties agree to the following division:

Wife shall be the sole owner of Physiques, Inc. and shall have all corporate shares or units, as well as any property, both real and personal, tangible and intangible of said corporation as her sole and separate property. Wife shall be responsible for all debts and accounts payable related to Physiques, Inc. and shall indemnify and hold Husband harmless therefrom. Husband relinquishes his interest in said business upon the execution of this Agreement, and shall execute all documents necessary to effectuate this provision.

Wife shall be the sole owner of TLC of Magnolia, LLC and shall have all corporate shares or units, as well as any property, both real and personal, tangible and intangible, of said corporation as her sole and separate property. Wife shall be responsible for all debts and accounts payable related to TLC of Magnolia, LLC and shall indemnify and hold Husband harmless therefrom. Husband relinquishes his interest in said business upon the execution of this Agreement, and shall execute all documents necessary to effectuate this provision.

Husband shall be the sole owner of Fallin Tractor, Inc. and shall have all corporate shares or units, as well as any property, both real and personal, tangible and intangible, of said corporation as his sole and separate property. Husband shall be responsible for all debts and accounts payable related to Fallin Tractor, Inc. and shall indemnify and hold Wife harmless therefrom. Wife relinquishes her interest in said business upon the execution of this Agreement, and shall execute all documents necessary to effectuate this provision.

2. SPOUSAL SUPPORT

Husband agrees to pay to Wife spousal support in the sum of $2,000 per month on the first day of the month, beginning 4/1/2012. Payments of spousal support shall terminate upon the death of either party, the remarriage of the party receiving spousal support, or after 120 months.

3. HEALTH INSURANCE

Husband agrees to provide health insurance coverage for Wife that is at least comparable to the health insurance offered to employees of Fallin Tractor, Inc. until remarriage of Wife.

4. OTHER

Husband agrees that Wife will be entitled to receive one (1) tank of gasoline for her vehicle each week from Fallin Tractor, Inc. at no cost to her.

Wife agrees to allow Husband to have gym membership for next 5 years.

. . . .

The PSA is signed by Tommy and Leanne and is dated May 9, 2012.

On December 16, 2013, Tommy filed a motion for summary judgment. He asked the court to cancel the PSA and to divide their marital property based on evidence submitted by the parties. The court set a final divorce hearing for April 22, 2014.

On the morning of the final hearing, Tommy filed a motion in limine asking the court to preclude Leanne from offering into evidence the PSA. The court addressed Tommy's motion in limine at the onset of the hearing. Both parties made arguments on whether the PSA was enforceable, and the court orally ruled that the PSA was unenforceable. However, the court allowed Leanne to introduce the PSA into evidence.

Leanne then presented her case. She first called Tommy as a witness. Tommy testified that he worked as the sales manager at Fallin Tractor, a business founded by his grandfather. He noted that his father now owns the majority of the company and acts as the manager. He testified that, at the time of the hearing, he owned 383 shares of Fallin Tractor, his brother owned 382 shares, and his father owned 2235 shares. He testified that his grandfather gave him 383 shares in 1972. He noted that he receives a monthly salary and commission of $4901 after deductions. He testified that he and Leanne own TLC of Magnolia ("TLC"), a commercial-property building, and Physiques, Inc. ("Physiques"), a fitness center where Leanne operates a cardiovascular-nursing business. He explained that Physiques rents its business space from TLC. Tommy recognized that Leanne's take-home pay from Physiques is roughly $2700 per month.

Tommy testified that he and Leanne's relationship began to deteriorate in early 2012 and that they began to discuss divorce and the division of their property at that time. He explained that Leanne found a form agreement on the Internet and that she drafted the PSA. He noted that they negotiated the terms and that she completed several drafts before they came to a final agreement. He testified that he signed the final version of the PSA on May 9, 2012, but that he did not think it was binding and that Leanne told him she would not file it. He testified that he did not consult an attorney during the negotiation process and that he signed the agreement under duress because he wanted to save his marriage. He admitted that he had affairs during the marriage and that one affair had occurred with an employee of Fallin Tractor. He further admitted that he had been taking hormone-replacement therapy and that

Leanne did not approve of the drugs. He also noted that he had moved into his family's cabin during the separation.

Tommy testified that in November 2011, prior to signing the PSA, he purchased his father's 2235 shares in Fallin Tractor. Tommy explained that he and his father had entered into a purchase agreement wherein he agreed to pay his father $6000 a month for the shares. He testified that they did not consult an appraiser, but they placed the total value of the business at $800,000. He explained that he had purchased the shares from his father because Leanne had pressured him, and he thought it would save his marriage.

Tommy stated that he defaulted on the loan with his father and that he consequently transferred the shares back to his father in July 2012—after he and Leanne had executed the PSA. He noted that he could have made payments toward the loan but that the sale had caused tension in his relationship with his father and his brother. He admitted that his father had given him notice of default only a month before the transfer occurred, but he denied reconveying the shares to avoid their inclusion in the marital estate. Tommy testified that he did not tell his father about the PSA and that Leanne had voluntarily relinquished any interest in Fallin Tractor. However, he admitted telling his parents that Leanne wanted an interest in the company so she could sell it. He stated that he did not recall whether he had told Leanne that he had transferred his shares back to his father so that the shares would not be marital property, but he "probably" did.

Tommy discussed an incident that occurred on April 17, 2012, when he gave Leanne a fraudulent stock certificate that purported to transfer 1309 shares in Fallin Tractor. He

explained that he gave Leanne the certificate because he wanted her to rethink the divorce.

Tommy testified that both he and Leanne had signed promissory notes and mortgages for TLC. He explained that the initial debt on TLC was over $1 million dollars, but the debt was below $950,000 at the time of the hearing. He testified that Leanne had been the primary manager of both TLC and Physiques and that she had made payments toward the companies' debts during their separation. Tommy agreed with Leanne's counsel that the value of his shares in Fallin Tractor at the time they executed the PSA exceeded the total value of Physiques and TLC combined. He also testified that he believed the value of their marital home to be $225,000.

Tommy's father, Thomas Fallin, Jr.("Tom"), testified that he sold 2235 shares in Fallin Tractor to Tommy for $600,000 in November 2011, but that he received only one payment from Tommy toward the debt. He explained that he gave Tommy a notice of default in July 2012 and that Tommy agreed to return the stock to him at that time. He testified that he knew Tommy and Leanne had been engaged in a bitter divorce and that Tommy had told him that Leanne wanted Tommy's shares in Fallin Tractor. He also testified that he filed a declaratory-judgment action against Tommy and Leanne in 2012 because he believed that Leanne wanted Tommy's shares in Fallin Tractor. He explained that when he filed the suit, he did not know that Tommy had entered into a PSA with Leanne wherein she agreed to relinquish all her rights to the company. He noted that he did not learn about the PSA until January 2013.

During Tommy's cross-examination of Tom, Tommy introduced into evidence the

pleadings from the declaratory-judgment action. In the complaint, Tom had asked the court to declare void the 2011 transfer of shares from Tom to Tommy because Leanne had engaged in a "deliberate and intentional fraud" against Tommy. Specifically, the complaint alleged that Leanne forced Tommy to buy the 2235 shares from Tom in 2011. The complaint also cited the fraudulent stock certificate that Tommy gave Leanne in April 2012 as part of Leanne's deceitful conduct.

Bob Edstrom, a certified public accountant, testified about valuations of Fallin Tractor, TLC, and Physiques. He explained that book value equals a company's assets minus its liabilities and noted that book value does not include goodwill. He testified that the combined book value of TLC and Physiques equaled $175,750 and that the value of the 2235 shares that Tommy purchased from his father equaled $679,374. Tommy objected to Edstrom's testimony, arguing that Arkansas law requires the use of the fair-market-value standard for valuing businesses in a divorce context, not the book value. The court overruled his objection.

Leanne then testified that she is a registered nurse and operates a cardiovascular-rehabilitation business through Physiques. She noted that Physiques also has a fitness center and a deli and that she manages both of them. She testified that TLC owns Physiques and that she and Tommy own TLC. She testified that she also manages TLC. Leanne agreed with Tommy that the appraised value of their home is $225,000.

Leanne explained that she and Tommy initially separated because of his affairs and his testosterone consumption. She testified that she told Tommy about her frustrations and that

he vowed to change, but he did not. She discussed the fraudulent stock certificate that Tommy gave her in April 2012 and noted that when she received the certificate, she believed it to be genuine. She testified that Tommy's gesture gave her hopes of reconciliation and that he moved back into their marital home that same week. She explained, however, that a week later, she discovered a Facebook conversation between Tommy and another woman and an email about an appointment with a doctor who distributes testosterone.

As to the PSA, Leanne testified that she found a form on the Internet and drafted the PSA. She stated that when Tommy signed the PSA, she believed that they had reached an agreement. She explained that she had composed more than one draft of the PSA because she and Tommy had disagreed on spousal support and the marital home; however, she stated that they always agreed that Tommy would receive all the shares in Fallin Tractor. Leanne testified that Tommy did not tell her that he assumed the PSA was not binding. She noted that she also drafted the entry of appearance and waiver of service signed by Tommy.

Leanne testified that she first learned that Tommy had given the Fallin Tractor shares back to his father through a text message that stated, "[H]a ha you've waited long enough now my dad has the tractor place back. It's not mine any longer." She stated that she received the text message after she had filed for divorce. She testified that she did not know that Tommy had failed to make loan payments to his father.

Leanne also testified that she had incurred substantial legal fees during the litigation of the divorce. She stated that she took out a loan for $15,000 and that she owed $9000 on that loan. She noted that she owed her attorney an additional $7000, which did not include the

fees associated with the hearing. She requested that Tommy be responsible for those fees. Upon questioning by the court, Leanne testified that when she used the term "sole" in the PSA, she meant "everything that you had."

Tommy then testified on his own behalf. He testified that he bought his father's shares in November 2011 because Leanne gave him an ultimatum: buy the shares or she would leave him. He stated that he returned the stock to his father because the sale had hurt their relationship, not because he could not make the payments.

Following the hearing, the court issued a letter on October 30, 2014, informing the parties that it planned to change its oral ruling and enforce the PSA. On November 6, 2014, Tommy filed a motion for Rule 52 findings by the court. On December 2, 2014, Leanne filed proposed facts and conclusions of law.[1]

On December 29, 2014, the court entered a divorce decree. In the decree, the court set aside its oral ruling from April 22, 2014, and approved and enforced the PSA with one modification. Specifically, the court struck paragraph four of the PSA because the clause provided for frequent contact between the parties. The court also denied Tommy's summary-judgment motion and adopted Leanne's proposed findings of fact and conclusions of law *in toto*. Accordingly, the court specifically found that the PSA was an equitable division of the marital property at the time the parties executed the agreement; that Tommy intentionally did not pay his father on the loan; that Tommy's income was nearly double Leanne's income;

---

[1] Tommy informed the court that he would not submit proposed facts and conclusions of law because he "did not believe that submitting findings of facts and conclusions of law… would change the [c]ourt's view" as expressed in its October 30, 2014 letter.

and that Tommy's deceptive conduct had substantially increased the litigation. The court also awarded Leanne attorney's fees in the amount of $10,000 "because much of the time and energy of the parties and their lawyers had been caused by [Tommy's] deceptive conduct." Tommy timely appealed the December 29, 2014 order to this court.

On appeal, Tommy first argues that the court erred in enforcing the PSA because the PSA did not provide for equitable distribution of the marital property pursuant to Arkansas Code Annotated section 9-12-315 (Repl. 2015). In making his argument, Tommy relies on this court's decision in *Rutherford v. Rutherford*, 81 Ark. App. 122, 98 S.W.3d 842 (2003).

In *Rutherford*, this court upheld a circuit court's refusal to enforce a settlement agreement. *Id*. In setting aside the agreement, the circuit court found that the wife had substantially breached the terms of the agreement and had exerted undue influence, duress, and fraud in the inducement on the husband in obtaining the agreement. *Id*. The wife appealed to this court and argued that Arkansas Code Annotated section 9-12-313 required a court to enforce a valid agreement of the parties. *Id*. Section 9-12-313 provides that "[c]ourts of equity may enforce the performance of written agreements between husband and wife made and entered into in contemplation of either separation or divorce." Ark. Code Ann. § 9-12-313. This court disagreed with the wife and stated,

> [T]he [circuit] court is not bound by a stipulation entered into by the parties: rather, it is within the sound discretion of the court to approve, disapprove, or modify the agreement. Arkansas Code Annotated section 9-12-313 merely provides the court with the means to enforce an agreement entered into and approved by the court and does not limit the court's discretion to accept or reject the agreement of the disputing parties. Even so, the trial court in exercising its discretion in the division of property matters must consider the factors set out in section 9-12-315.

12

*Rutherford*, 81 Ark. App. at 128–29, 98 S.W.3d at 845. Section 9-12-315 provides that "[a]ll marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable. In that event the court shall make some other division that the court deems equitable taking into consideration" nine factors.

Here, Tommy focuses on the statement in *Rutherford* that "the trial court in exercising its discretion in the division of property matters must consider the factors set out in section 9-12-315," and asserts that *Rutherford* requires a circuit court to consider the factors in section 9-12-315 when deciding whether a settlement agreement is enforceable. In other words, Tommy argues that if a settlement agreement does not follow section 9-12-315, a court cannot enforce it. We find Tommy's argument unpersuasive. *Rutherford* does not require a court to consider the factors in section 9-12-315 when deciding whether to enforce a settlement agreement. *Rutherford* points out that a circuit court must follow section 9-12-315 in dividing the marital property only if it concludes that a settlement agreement is unenforceable.

Tommy additionally argues that the circuit court erred in relying on the book value of Fallin Tractor, TLC, and Physiques because section 9-12-315 requires the use of the fair-market-value standard for valuing a business in a marital-property context. He asserts that because the circuit court used the wrong standard, it erroneously found that the PSA equitably divided the property. Because we have concluded that the PSA did not have to equitably divide the property pursuant to section 9-12-315, we need not consider which valuation standard section 9-12-315 requires. We must point out, however, that Tommy admitted at

SLIP OPINION

the hearing that at the time they executed the PSA, the value of his shares in Fallin Tractor exceeded the total value of Physiques and TLC combined.

Tommy also argues that the alimony award cannot be enforced because the award was made in conjunction with an inequitable property division. Again, because we have concluded that the PSA did not have to equitably divide the property pursuant to section 9-12-315, we need not consider whether the alimony award was also inequitable.

Tommy next argues that the PSA is unenforceable because it is incomplete. Tommy asserts that the PSA is incomplete because it (1) does not divide some bank accounts shared by him and Leanne, (2) suggests that the parties had divided tangible personal property when they had not, and (3) does not provide how Tommy would collect on the $80,000 from the marital home if Leanne predeceased him. However, Tommy cites no authority that requires a property-settlement agreement to address every piece of marital property before a court can enforce it. Indeed, Arkansas Code Annotated section 9-12-315 provides that "[a]t the time a divorce decree is entered [a]ll marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable . . . except [p]roperty excluded by valid agreement of the parties." Ark. Code Ann. § 9-12-315 (a)(1) & (b)(4). Thus, the statute contemplates partial settlement agreements.

Tommy also argues that the PSA is incapable of enforcement because it states that Tommy "shall be the sole owner of Fallin Tractor." Tommy points out that he has never been the sole owner of the company because, at all times relevant to this case, his brother owned shares. Questions relating to the construction, operation, and effect of separation

14

agreements between husband and wife are governed, in general, by the rules and provisions applicable in the case of other contracts. *Sutton v. Sutton*, 28 Ark. App. 165, 771 S.W.2d 792 (1989). It has long been established that the first rule of interpretation is to give to the language employed by the parties to a contract the meaning they intended. *Id.* When contracting parties express their intention in a written instrument in clear and unambiguous language, it is our duty to construe the written agreement according to the plain meaning of the language employed. *Coble v. Sexton*, 71 Ark. App. 122, 27 S.W.3d 759 (2000).

In this case, the PSA initially states, "[T]he parties acquired various items of real and personal property and debts, and such items and debts are disposed of as follows." The PSA then states that Tommy "shall be the sole owner of Fallin Tractor." The agreement clearly contemplates only the shares owned by Tommy, and we cannot say that the circuit court erred in enforcing it.

Tommy's final argument is that the circuit court erred in awarding Leanne $10,000 in attorney's fees. In domestic-relations proceedings, the trial court has the inherent power to award attorney's fees, and whether the circuit court should award fees and the amount thereof are matters within the court's discretion. *Tiner v. Tiner*, 2012 Ark. App. 483, 422 S.W.3d 178. Due to the circuit court's intimate acquaintance with the record and the quality of services rendered, we usually recognize the superior perspective of the circuit court in assessing the applicable factors, and an award of attorney's fees will not be set aside absent an abuse of discretion. *Id.* Finally, when addressing a circuit court's award of attorney's fees, our courts have often observed that there is no fixed formula in determining what is reasonable. *Id.*

15

In this case, the court specifically considered both parties' finances and found that Tommy's income was almost twice as much as Leanne's. The court further found that Tommy's deceptive conduct had substantially increased the litigation. Accordingly, based on our standard of review and the record before us, we cannot say that the circuit court abused its discretion in awarding Leanne $10,000 in attorney's fees.

Affirmed.

GRUBER and VAUGHT, JJ., agree.

*Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*; and *Eugene D. Bramblett*, for appellant.

*Bell & Boyd, PLLC*, by: *Michael W. Boyd* and *Karen Talbot Gean*, for appellee.